## In the United States District Court
## for the Eastern District of Wisconsin
## Milwaukee Division

**Wisconsin Right to Life Committee, Inc.,** and Wisconsin Right to Life State Political Action Committee,

*Plaintiffs*

*v.*

Civil Action No. ____

**Gordon Myse,** in his official capacity as chair and member of the Wisconsin Government Accountability Board; Thomas Barland, in his official capacity as vice chair and member of the Wisconsin Government Accountability Board; Michael Brennan, Thomas Cane, David Deininger, and Gerald Nichol, in their official capacities as members of the Wisconsin Government Accountability Board; and John Chisholm, in his official capacity as Milwaukee County district attorney,

*Defendants*

## Plaintiffs' Preliminary Injunction Brief

1

# Table of Contents

Table of Contents ............................................................ 2

I.   Background ............................................................ 4

II.  Discussion ............................................................ 4

    A.   Justiciability ............................................................ 4

        1.   Standing ............................................................ 4

            a.   Constitutional Standing ................................ 4
            b.   Prudential Standing ..................................... 9

        2.   Ripeness ............................................................ 9

    B.   Preliminary Injunction Standard ..................................... 12

    C.   First Principles ............................................................ 12

        1.   The Limited Power of Government............................. 12
        2.   The First and Fourteenth Amendments as a
             Restriction on the Already Limited Power of Government........ 14

            a.   Vagueness ........................................... 14
            b.   Overbreadth ......................................... 16

        3.   Determining the Meaning of Political Speech and
             whether Government may Regulate it ........................ 21

    D.   Vagueness ............................................................ 21

        1.   The Order of Questions for Political Committee Status ........... 21
        2.   Wisconsin Law is Vague, and therefore Overbroad ................ 22
        3.   Why Wisconsin Law is Vague, and therefore Overbroad ......... 23

    E.   Overbreadth:  In General ............................................ 30

    F.   Overbreadth:  The Committee/Political Committee,
         "Persons other than Political Committees,"  and
         Organization Definitions ............................................ 33

2

|   |   | 1. | Strict Scrutiny | ......................................................... | 33 |
|   |   | 2. | The Burdens of Being a Political Committee | ............................ | 34 |
|   |   | 3. | The "Under the Control of a Candidate" and Major Purpose Tests | ......................................... | 36 |
|   |   | 4. | The Tests as a Shield against Regulation as a State Political Committee | ................................ | 39 |
|   |   | 5. | The Tests in Wisconsin | ......................................... | 42 |
|   |   | 6. | Applying the "Under the Control of a Candidate" Test | ............. | 43 |
|   |   | 7. | Applying the Major Purpose Test | ................................ | 44 |
|   |   | 8. | What the "Under the Control of a Candidate" and Major Purpose Tests Do Not Ask | ................................ | 46 |
|   |   | 9. | Applying Strict Scrutiny | ......................................... | 50 |
|   | G. |   | Overbreadth: The Section 1.28 and Section 1.91 Requirements | ......................................... | 54 |
|   |   | 1. | Exacting Scrutiny | ......................................... | 55 |
|   |   | 2. | Spending for Political Speech | ........................................ | 60 |
|   |   | 3. | Government's Interest in Disclosure | ......................................... | 67 |
|   |   | 4. | Applying Exacting Scrutiny | ......................................... | 71 |
|   | H. |   | Overbreadth: 24 Hour Reporting | ........................................ | 74 |
|   | I. |   | Overbreadth: Oath for Independent Disbursements | ........................... | 75 |
|   | J. |   | Overbreadth: Political Committee Reporting Thresholds | ................... | 78 |
|   | K. |   | Overbreadth: The Political Committee Contribution Limit and Solicitations for an Entity's Separate Segregated Fund | .............. | 79 |
|   |   | 1. | Strict Scrutiny for Contribution Limit | ....................................... | 79 |
|   |   | 2. | Intermediate Scrutiny for Contribution Limit | ........................... | 80 |
|   |   | 3. | Scrutiny for Limit on Solicitations for an Entity's Separate Segregated Fund | ........................................ | 82 |
|   | L. |   | Overbreadth: Attribution and Disclaimer Requirements | ................... | 82 |
|   | M. |   | Facially Unconstitutional | ......................................... | 83 |
|   | N. |   | Narrowing Glosses, Certification, and Severability | ......................... | 87 |
| III. |   |   | Conclusion | ......................................... | 89 |

Certificate of Service to be filed after service

Plaintiffs Wisconsin Right to Life, Inc. ("WRTL"), and Wisconsin Right to Life State Political Action Committee ("WRTL-SPAC") file this preliminary-injunction brief.

## I.  Background

For the background, Plaintiffs refer the Court to the verified complaint.[1]

## II.  Discussion

### A.  Justiciability

#### 1.  Standing

##### a.  Constitutional Standing

Plaintiffs meet all three criteria for constitutional standing under *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992):  The holdings they seek will (3) likely redress the (1) injury in fact that the (2) challenged law causes.

When law infringes persons' First Amendment rights, the persons need not violate the law, thereby exposing themselves to civil enforcement or criminal prosecution, to have standing to challenge it.  *See Steffel v. Thompson,* 415 U.S. 452, 459 (1974) (citing  *Epperson v. Arkansas,* 393 U.S. 97 (1968)).  Although persons will lack standing when they have only an "imaginary or speculative" fear of enforcement or prosecution, *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979) (quoting *Younger v. Harris,* 401 U.S. 37, 42 (1971)) – such as when they neither (1) have received a threat of enforcement or prosecution, (2) claim that

---

[1] VERIFIED COMPL. ("VC") Part I.

enforcement or prosecution is likely, nor (3) allege the enforcement or prosecution is even remotely possible, *id.* (quoting *Younger,* 401 U.S. at 42) – persons who allege "an actual and well-founded fear" of enforcement or prosecution have standing to file a pre-enforcement action. *Virginia v. American Booksellers Ass'n, Inc.,* 484 U.S. 383, 393 (1988).

In First Amendment challenges, the test for standing is quite forgiving, *New Hampshire Right to Life PAC v. Gardner,* 99 F.3d 8, 14 (1st Cir. 1996) ("*NHRL*"), and courts apply it "most loosely … to provide broad protection for speech." *Florida Family Policy Council v. Freeman,* 561 F.3d 1246, 1253 (11th Cir. 2009) (quoting *Pittman v. Cole,* 267 F.3d 1269, 1283 (11th Cir. 2001)).

Looking to when Plaintiffs filed the complaint, *see Davis v. FEC,* 554 U.S. ____, ____, 128 S.Ct. 2759, 2769 (2008) (citing *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180 (2000)), and looking to each claim, *see id.* (quoting *Lewis v. Casey,* 518 U.S. 343, 358 n. 6 (1996); *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 352 (2006)), Plaintiffs have standing for each of their claims.

First, part of WRTL's and WRTL-SPAC's injury is the chill to speech caused by Defendants' prospective enforcement of Wisconsin law or prosecution of WRTL or WRTL-SPAC. The relief they seek will redress this chill, thereby allowing them to do their speech without fear of enforcement or prosecution. Therefore, they have standing to seek relief from the chill. *See Majors v. Abell,* 317 F.3d 719, 721-22 (7th Cir. 2003) ("*Majors I*").

The danger in a chill, which the Supreme Court has continually reaffirmed,[2] "is, in large measure, one of self-censorship[,] a harm that can be realized even without an actual [enforcement or] prosecution." *American Booksellers,* 484 U.S. at 393. Any regulation of political speech can chill it. *See Citizens United v. FEC,* 558 U.S. ____, ____, 130 S.Ct. 876, 895 (2010). The chill itself is a harm, *National Rifle Ass'n of Am. v. Magaw,* 132 F.3d 272, 285 (6th Cir. 1997) (quoting *Dombrowski v. Pfister,* 380 U.S. 479, 486 (1965)), and the very existence of law chilling speech causes the chill. *See Majors I,* 317 F.3d at 721-22 ("the threat is latent in the existence of the statute"), *quoted in California Pro-Life Council v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003) ("*CPLC I*"); *North Carolina Right to Life, Inc. v. Bartlett,* 168 F.3d 705, 711 (4th Cir. 1999) ("*NCRL I*") ("the statute's mere existence risks chilling First Amendment rights"), *cert. denied,* 528 U.S. 1153 (2000).

Second, WRTL and WRTL-SPAC have standing in part because they already do their speech and comply with some of the law they challenge, as opposed to being chilled and therefore not doing their speech. WRTL and WRTL-SPAC will continue doing their speech and complying with the law while asking the Court to declare the law unconstitutional and enjoin its enforcement so compliance is no longer necessary. *See Davis,* 128 S.Ct. at 2769.

---

[2] *See, e.g., Citizens United v. FEC,* 558 U.S. ____, ____, 130 S.Ct. 876, 889, 891, 892, 894, 895, 896, 905, 908, 916 (2010); *FEC v. Wisconsin Right to Life, Inc.,* 551 U.S. 449, 468, 469 (2007) ("*WRTL II*"); *Buckley v. Valeo*, 424 U.S. 1, 41 n.47, 82 n.109 (1976).

6

As to all of Plaintiffs' claims, when law regulates speech, "there is a presumption of a credible threat of [civil enforcement or criminal] prosecution." *Virginia Soc'y for Human Life, Inc. v. FEC,* 263 F.3d 379, 388 (4th Cir. 2001) ("*VSHL II*") (citing *NCRL I,* 168 F.3d at 709); *see also NHRL,* 99 F.3d at 15 (holding that, absent compelling contrary evidence, courts presume a credible threat of prosecution in pre-enforcement challenges to nonmoribund law regulating speech (collecting authorities)). "This presumption is particularly appropriate when [law] chill[s] the exercise of First Amendment rights." *VSHL II,* 263 F.3d at 388 (citing *NCRL I,* 168 F.3d at 709).

No assurance from Defendants that they will not enforce Wisconsin law or prosecute Plaintiffs deprives them of standing. *See Citizens for Responsible Gov't State PAC v. Davidson,* 236 F.3d 1174, 1192-93 (10th Cir. 2000); *Vermont Right to Life Comm., Inc. v. Sorrell,* 221 F.3d 376, 383-84 (2d Cir. 2000) ("*VRLC I*"); *NCRL I,* 168 F.3d at 711. Holding otherwise would place Plaintiffs' "First Amendment rights 'at the sufferance of'" Defendants. *VRLC I,* 221 F.3d at 383 (quoting *NCRL I,* 168 F.3d at 711).

And Plaintiffs need not raise their First Amendment claims in a state forum before raising them in federal court. *See id.* at 382 n.1 (citing *American Booksellers,* 484 U.S. at 392-93; *Babbitt,* 442 U.S. at 298-99). Plaintiffs need not seek advice, including advisory opinions, from government officials before seeking to vindicate their First Amendment rights in federal court. *See Citizens United,* 130 S.Ct. at

7

898;[3] *North Carolina Right to Life, Inc. v. Leake,* 525 F.3d 274, 296 (4th Cir. 2008) ("*NCRL III*"). "The First Amendment does not permit laws that force speakers to retain a campaign[-]finance attorney, conduct demographic[-]marketing research, or seek declaratory rulings before discussing the most salient political issues of our day." *Citizens United,* 130 S.Ct. at 889.

Even if Defendants adopted a policy not to enforce the law Plaintiffs challenge or prosecute anyone under the law, they would still have standing, because such a policy, unlike a statute or regulation, does "not carry the binding force of law. Th[ose] who adopted the policy might be replaced with [others] who disagree with it, or some of th[ose who approved it] might change their minds." *VSHL II,* 263 F.3d at 388 (citing *Chamber of Commerce v. FEC,* 69 F.3d 600, 603 (D.C. Cir. 1995)). Government's promise to use unconstitutional law responsibly does not justify upholding it. *United States v. Stevens,* 559 U.S. ____, ____, 130 S.Ct. 1577, 1591 (2010) (citing *Whitman v. American Trucking Ass'ns, Inc.,* 531 U.S. 457, 473 (2001)).

Moreover, "the injury required for standing need not be actualized." *Davis,* 128 S.Ct. at 2769. Even if the injury that exists upon the filing of the suit dissipates, that does not deprive Plaintiffs of standing. *See id.*

---

[3] This supersedes the contrary statement in *McConnell v. FEC,* 540 U.S. 93, 170 n.64 (2003).

### b.     Prudential Standing

In general, parties with constitutional standing have prudential standing as well.  *Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 81 (1978) (citing *Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252 (1977)). Plaintiffs have prudential standing, because it is arguable[4] that their injuries are in the "zone of interests" the challenged law regulates.  *FEC v. Akins,* 524 U.S. 11, 20 (1998) ("protected or regulated" (quoting *National Credit Union Admin. v. First Nat. Bank & Trust Co.,* 522 U.S. 479, 488 (1998))).

### 2.     Ripeness

Unlike with standing, a court determines whether a claim is ripe or moot as of now, not as of the filing of the complaint.  *See Blanchette v. Connecticut Gen. Ins. Corps.,* 419 U.S. 102, 140 (1974) ("since ripeness is peculiarly a question of timing, it is the situation now ... that must govern"); *Powell v. McCormack,* 395 U.S. 486, 496 (1969) (holding that claims are "moot when the issues presented are no longer 'live'" (citations omitted)).

Ripeness turns on "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Abbott Labs. v. Gardner,* 387 U.S. 136, 149 (1967), *abrogated on other grounds, Califano v. Sanders,* 430 U.S. 99, 105 (1977).

---

[4] It is more than arguable, but "arguable" suffices.

9

As with standing, courts apply the ripeness doctrine loosely in the First Amendment context. *Cheffer v. Reno,* 55 F.3d 1517, 1523 n.12 (11th Cir. 1995) (citing *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale,* 922 F.2d 756, 760 (11th Cir. 1991)); *see also Carey v. Wolnitzek,* ____ F.3d ____, ____, manuscript op. at 7 (6th Cir. July 13, 2010) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973));[5] *Peachlum v. City of York, Pa.,* 333 F.3d 429, 434 (3d Cir. 2003) (citing *Dougherty v. Board of Zoning Appeals,* 282 F.3d 83, 90 (2d Cir. 2002)).

Pre-enforcement challenges are ripe when:

- They address laws chilling speech. *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n,* 233 F.3d 981, 986 (7th Cir. 2000) (citing *Commodity Trend,* 149 F.3d 679, 689-90 (7th Cir. 1998)), or

- A speaker is already doing or will do its speech, and is already complying or will comply with the challenged law but asks a court to declare the law unconstitutional and enjoin its enforcement so compliance is no longer necessary. *See Peachlum v. City of York, Pa.,* 333 F.3d 429, 435 (3d Cir. 2003) ("Our stance toward pre-enforcement challenges stems from a concern that a person will merely comply with an illegitimate statute rather than be subjected to [enforcement or] prosecution." (citing *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio,* 40 F.3d 1454, 1467 (3d Cir. 1994))).

"First Amendment rights of free expression and association are particularly apt to be found ripe for immediate protection, because of the fear of irretrievable loss." *Kansas Judicial Review v. Stout,* 519 F.3d 1107, 1116 (10th Cir. 2008) (quoting *New*

---

[5] *Available at* http://www.ca6.uscourts.gov/opinions.pdf/10a0199p-06.pdf (all Internet sites visited Aug. 2, 2010).

Case 2:10-cv-00669-CNC   Filed 08/05/10   Page 10 of 89   Document 4

*Mexicans for Bill Richardson v. Gonzales,* 64 F.3d 1495, 1499, 1500 (10th Cir. 1995)).

This action is fit for judicial decision, because the outstanding issues are purely legal. *See Jacobus v. Alaska,* 338 F.3d 1095, 1105 (9th Cir. 2003) (citing *San Diego County Gun Rights Comm. v. Reno,* 98 F.3d 1121, 1132-33 (9th Cir. 1996)); *VSHL II,* 263 F.3d at 390 (quoting *Abbott,* 387 U.S. at 149). "Sufficient hardship is usually found if the [law] imposes costly, self-executing compliance burdens or if it chills protected First Amendment activity." *Minnesota Citizens Concerned for Life v. FEC,* 113 F.3d 129, 132 (8th Cir. 1997) ("*MCCL*") (citing *Reno v. Catholic Soc. Servs., Inc.,* 509 U.S. 43, 69-71 (1993) (O'Connor, J., concurring)), *quoted in National Rifle Ass'n,* 132 F.3d at 279. Not addressing Plaintiffs' claims would cause them hardship, because Wisconsin law imposes such burdens. It also chills First Amendment rights when Plaintiffs must refrain from exercising their First Amendment rights or risk enforcement of the law. *See Kansas Judicial Review,* 519 F.3d at 1117-18; *VSHL II,* 263 F.3d at 390 (citing *Abbott,* 387 U.S. at 153). Therefore, Plaintiffs' claims are ripe.

Government need not have enforced such law against a person challenging it or prosecuted the person for a court to hold the law unconstitutional. *See, e.g., FEC v. Wisconsin Right to Life, Inc.,* 551 U.S. 449, 462-63 (2007) ("*WRTL II*") (addressing mootness).

11

## B.  Preliminary Injunction Standard

Plaintiffs "seeking a preliminary injunction must establish [(1)] that [they are] likely to succeed on the merits, [(2)] that [they are] likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in [their] favor, and [(4)] that an injunction is in the public interest." *Winter v. Natural Resources Def. Council, Inc.,* 555 U.S. ____, ____, 129 S.Ct. 365, 374 (2008) (citations omitted).

Plaintiffs submit they prevail on each of these four factors.  As to the second, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976).  So unless Plaintiffs receive the relief they request, they will suffer irreparable harm.  There is no adequate remedy at law.  *See id.*  As to the third and fourth, "the potential harm to independent expression and certainty in public discussion of issues is great and the public interest favors protecting core First Amendment freedoms." *Iowa Right to Life Comm., Inc. v. Williams,* 187 F.3d 963, 970 (8th Cir. 1999).

For the reasons that follow, Plaintiffs submit they prevail on the first factor as well.

## C.  First Principles

### 1.  The Limited Power of Government

Campaign-finance laws regulate speech at the heart of republican – *i.e.,* a democratically elected representative – government.  Thus, it is useful to back up

12

and recall the underlying principles. *See, e.g., FEC v. Wisconsin Right to Life, Inc.,* 551 U.S. 449, 481-82 (2007) ("*WRTL II*").

In the United States, persons[6] are free to engage in political speech except when government constitutionally limits, bans, or otherwise regulates it. The presumption is not that political speech is limited, much less banned, except when government permits it. Nor is the presumption that political speech is regulated except when government permits it to occur without regulation. In other words, freedom of speech is the norm, not the exception. *See, e.g., Citizens United v. FEC,* 558 U.S. ____, ____, 130 S.Ct. 876, 911 (2010) ("more speech, not less, is the governing rule"); *Buckley v. Valeo,* 424 U.S. 1, 14-15 (1976).

The framers established government with the consent of the governed, and government has only those limited and enumerated powers that the governed surrendered to it in the first place. In some instances, those powers may be large. Nevertheless, they are limited and enumerated.

> Extraordinary conditions may call for extraordinary remedies. But the argument necessarily stops short of an attempt to justify action [that] lies outside the sphere of constitutional authority. Extraordinary conditions do not create or enlarge constitutional power. … Those who act under these grants are not at liberty to transcend the imposed limits because they believe that more or different power is necessary.

---

[6] References to "persons" are to legal persons, not just to individuals.

13

*A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 528-29 (1935) (footnote omitted) (citing *Ex parte Milligan,* 71 U.S. (4 Wall.) 2, 120, 121 (1866); *Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 426 (1934)).[7]

### 2. The First and Fourteenth Amendments as Restrictions on the Already Limited Power of Government

Whatever government does, it may not exceed the limited power that the people have delegated to it. This power – including the "constitutional power of Congress to regulate federal elections[,]" *Buckley,* 424 U.S. at 13 & n.16, and each state's parallel power over its own, though not other states', elections, *see, e.g., North Carolina Right to Life, Inc. v. Leake,* 525 F.3d 274, 281 (4th Cir. 2008) ("*NCRL III*") (citing *Buckley,* 424 U.S. at 13); WIS. CONST. art. III – is further constrained by other law, including the First and Fourteenth Amendments.

#### a. Vagueness

Under the Fourteenth Amendment, U.S. CONST. amend. XIV (1868), state law regulating political speech must not be vague. When government seeks to regulate

---

[7] The Court has noted that the "'powers delegated by the … Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite.'" *United States v. Lopez,* 514 U.S. 549, 552 (1995) (quoting JAMES MADISON, THE FEDERALIST, No. 45, at 292-293 (C. Rossiter ed. 1961)). However, this does not mean state governments themselves do not have limited and enumerated powers. *See, e.g.,* U.S. CONST. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, *or to the people*" (emphasis added)); *Knapp v. Schweitzer,* 357 U.S. 371, 375 (1958) ("our Constitution is one of particular powers given to the National Government with the powers not so delegated reserved to the States or, in the case of *limit[]s upon both governments, to the people*" (emphasis added)), *overruled on other grounds, Murphy v. Waterfront Comm'n of New York Harbor,* 378 U.S. 52, 75-77 (1964).

14

something "so closely touching our most precious freedoms," law must be precise. *Buckley,* 424 U.S. at 41 (quoting *NAACP v. Button,* 371 U.S. 415, 438 (1963)). Vague laws threaten to "trap the innocent by not providing fair warning," they give reign to "arbitrary and discriminatory application," and they force citizens to "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Id.* at 41 n.48 (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108-09 (1972)). A vague law "puts the speaker[s] in these circumstances wholly at the mercy of the varied understanding of [their] hearers and consequently of whatever inference may be drawn as to [the speakers'] intent and meaning. [This] blankets with uncertainty whatever may be said. It compels the speaker[s] to hedge and trim." *Id.* at 43 (quoting *Thomas v. Collins,* 323 U.S. 516, 535 (1945)). A vague law thereby "chill[s] speech: People 'of common intelligence must necessarily guess at the law's meaning and differ as to its application.'" *Citizens United,* 130 S.Ct. at 889 (brackets omitted) (quoting *Connally v. General Constr. Co.,* 269 U. S. 385, 391 (1926)).

To avoid the problems vagueness causes, law regulating political speech must also be simple and concise. "First Amendment standards must eschew the open-ended rough-and-tumble of factors, which invites complex argument in a trial court and a virtually inevitable appeal." *Id.* at 896 (brackets and internal quotation marks omitted) (quoting *WRTL II,* 551 U.S. at 469). Complex laws regulating political speech are in effect prior restraints. *Id.* at 895. "Prolix laws chill speech for the same reason that vague laws chill speech[,]" *id.* at 889, and "First

15

Amendment freedoms need breathing space to survive." *Id.* at 892 (quoting *WRTL II,* 551 U.S. at 468-49). "The First Amendment does not permit laws that force speakers to retain a campaign finance attorney … or seek declaratory rulings before discussing the most salient political issues of our day." *Id.* at 889.

### b. Overbreadth

The absence of vagueness, however, does not make law regulating political speech constitutional. *See WRTL II,* 551 U.S. at 479 (quoting *FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 263 (1986) ("*MCFL*")).

Even non-vague law regulating political speech must comply with the First Amendment. U.S. CONST. amend. I (1791). The First Amendment guards against overbreadth, *Buckley,* 424 U.S. at 80 ("impermissibly broad"),[8] and political speech is at the core of what the First Amendment protects.[9]

---

[8] One should not confuse this overbreadth with the substantial overbreadth courts address in assessing facial unconstitutionality. *Infra* Part II.M.

[9] *See Citizens United v. FEC,* 558 U.S. ____, ____, 130 S.Ct. 876, 892 (2010) (citing *Morse v. Frederick,* 551 U.S. 393, 403 (2007)); *id.* at 895 ("the primary importance of speech itself to the integrity of the election process"); *FEC v. Wisconsin Right to Life, Inc.,* 551 U.S. 449, 468 (2007) ("*WRTL II*"); *McConnell v. FEC,* 540 U.S. 93, 217 (2003) (quoting *Buckley v. Valeo,* 424 U.S. 1, 48 (1976)), *overruled on other grounds, Citizens United,* 130 S.Ct. at 896-914; *FEC v. Colorado Republican Fed. Campaign Comm.,* 518 U.S. 604, 616 (1996) ("*Colorado Republican I*") (citing *Eu v. San Francisco County Democratic Cent. Comm.,* 489 U.S. 214, 231 (1989)); *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 346-47 (1995); *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 657 (1990) (quoting *Buckley,* 424 U.S. at 39), *overruled on other grounds, Citizens United,* 130 S.Ct. at 896-914; *FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 251 (1986) ("*MCFL*") (quoting *Buckley,* 424 U.S. at 39); *FEC v. National Conservative PAC,* 470 U.S. 480, 493 (1985) ("*NCPAC*") (quoting *Buckley,* 424 U.S. at 14); *Buckley,* 424 U.S. at 44-45.

> Discussion of public issues [is] integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order "to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States,* 354 U.S. 476, 484 (1957). Although First Amendment protections are not confined to "the exposition of ideas," *Winters v. New York,* 333 U.S. 507, 510 (1948), "there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs of course including discussions of candidates." *Mills v. Alabama,* 384 U.S. 214, 218 (1966). This no more than reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964).

*Buckley,* 424 U.S. at 14 (brackets and ellipsis omitted), *quoted in Citizens United,* 130 S.Ct. at 898, *WRTL II,* 551 U.S. at 467, *and McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 346 (1995). Or, as the Supreme Court has also held:

> The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment. Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.

*First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 776 (1978) (ellipsis omitted) (quoting *Thornhill v. Alabama,* 310 U.S. 88, 101-02 (1940)). There "is practically universal agreement that a major purpose of the First Amendment was to protect the free discussion of governmental affairs." *Id.* at 776-77 (brackets omitted) (quoting *Mills v. Alabama,* 384 U.S. 214, 218 (1966)). "Freedom of expression has particular significance with respect to government because it is here that the state has a special incentive to repress opposition and often wields a more effective power

17

of suppression." *Id.* at 777 n.11 (citations, brackets, and internal quotations marks

omitted). Political

> "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana,* 379 U.S. 64, 74-75 (1964). And self-government suffers when those in power suppress competing views on public issues "from diverse and antagonistic sources." *Associated Press v. United States,* 326 U.S. 1, 20 (1945), *quoted in New York Times Co. v. Sullivan,* 376 U.S. 254, 266 (1964).

*Bellotti,* 435 U.S. at 777 n.12. Government is "constitutionally disqualified from

dictating the subjects about which persons may speak and the speakers who may

address a public issue." *Id.* at 784-85 (citing *Police Dep't of Chicago v. Mosley,* 408

U.S. 92, 96 (1972)).

> Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people. The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it.

*Citizens United,* 130 S.Ct. at 898 (internal citation omitted).

Thus, it is not surprising – as *WRTL II* repeatedly emphasizes – that where

"the First Amendment is implicated, the tie [(if there is one)] goes to the speaker,

not the censor." 551 U.S. at 474. The law "must give the benefit of any doubt to

protecting rather than stifling speech." *Id.* at 469 (citing *New York Times,* 376 U.S.

at 269-70), *quoted in Citizens United,* 130 S.Ct. at 891. In other words, "we give the

benefit of the doubt to speech, not censorship." *Id.* at 482.

Nor is it surprising that the First Amendment – premised as it is on

"mistrust of government[] power," *Citizens United,* 130 S.Ct. at 882 – protects the

use of money for political speech, *see, e.g., Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 657 (1990) (holding that using money to support a candidate is speech (quoting *Buckley,* 424 U.S. at 39)), *overruled on other grounds, Citizens United*, 130 S.Ct. at 896-914; *Bellotti,* 435 U.S. at 785 n.23 (citing *Buckley,* 424 U.S. at n.16); *Buckley,* 424 U.S. at 16-17 (collecting authorities), including spending for political speech by domestic corporations, such as WRTL.[10]

Furthermore, group association enhances effective advocacy, particularly but not only when ideas or subjects are controversial. *See Buckley,* 424 U.S. at 15 (quoting *NAACP v. Alabama,* 357 U.S. 449, 460 (1958)).

---

[10] *Citizens United v. FEC,* 558 U.S. ____, ____, 130 S.Ct. 876, 886 (2010) (noting that *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652 (1990), which *Citizens United* overruled, 130 S.Ct. at 896-914, upheld a speech ban because the speaker was a corporation); *id.* at 898-99 (citing *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 784 (1978)); *id.* at 900 (quoting *Bellotti,* 435 U.S. at 784, 776); *id.* at 902 (quoting *Bellotti,* 435 U.S. at 784-85); *id.* at 903 ("the First Amendment does not allow political[-]speech restrictions based on a speaker's corporate identify" (citing *Bellotti*)); *id.* at 899 ("the [g]overnment may commit a constitutional wrong when by law it identifies certain preferred speakers"); *id.* at 904-911; *id.* at 911 (citing 2 U.S.C. § 441e (2002)); *id.* at 913 ("[g]overnment may not suppress political speech on the basis of the speaker's corporate identify. No sufficient government[] interest justifies limits on the political speech of nonprofit or for-profit corporations"); *FEC v. Wisconsin Right to Life, Inc.,* 551 U.S. 449, 477-78 (2007) ("*WRTL II*") (citing *Bellotti,* 435 U.S. at 776-77); *Austin,* 494 U.S. at 657 (citing *Bellotti,* 435 U.S. at 777); *Bellotti,* 435 U.S. at 780 n.15 (citing *Santa Clara County v. Southern Pac. R. Co.,* 118 U.S. 394 (1886)); *id.* at 784, *cited in Citizens United,* 130 S.Ct. at 921-22 (Roberts, C.J., concurring). While *Bellotti* was about ballot issues, 435 U.S. at 767-68, 795, its holding is not limited to corporations, *see id.* at 776-77, or ballot issues. *See, e.g., Citizens United,* 130 S.Ct. at 921-22 (Roberts, C.J., concurring); *Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 298 (1981) (distinguishing "issues," which includes more than ballot issues, from "candidates for public office" (quoting *Bellotti,* 435 U.S. at 790)).

19

Thus, the government's power to regulate *elections* is an exception to the norm of freedom of speech. *See Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 296-97 (1981) ("*Buckley* identified a single narrow exception to the rule that limits on political activity were contrary to the First Amendment"). The power to regulate *elections* is also self-limiting. As the Fourth Circuit has explained:

> *Buckley* ... recognized that legislatures have ... power to regulate elections, and ... may establish standards that govern the financing of political campaigns. ... The Court simultaneously noted, however, that campaign finance restrictions operate in an area of the most fundamental First Amendment activities, and thus threaten to limit ordinary political expression. ...
>
> *Buckley* ... recognized the need to cabin legislative authority over elections in a manner that sufficiently safeguards vital First Amendment freedoms. It did so by demarcating a boundary between regulable election-related activity and constitutionally protected political speech: after *Buckley,* campaign finance laws may constitutionally regulate only those actions that are unambiguously related to the campaign of a particular ... candidate.

*NCRL III,* 525 F.3d at 281 (brackets, citations, and internal quotation marks omitted).[11] This principle helps ensure government regulates only speech that government has the "power to regulate," *id.* at 282, *i.e.,* speech that government has a constitutional interest in regulating. *See id.* at 281 (citing *Buckley,* 424 U.S. at 80). This principle is part of the larger principle that law regulating political speech

---

[11] *See also New Mexico Youth Organized v. Herrera,* \_\_\_\_ F.3d \_\_\_\_, \_\_\_\_, manuscript op. at 13 (10th Cir. June 30, 2010) (addressing disclosure by persons government may regulate as political committees under *Buckley,* 424 U.S. at 74-79, and disclosure of spending for political speech by others), *available at* http://www.ck10.uscourts.gov/opinions/09/09-2212.pdf.

must not be overbroad, *see Buckley,* 424 U.S. at 80 ("impermissibly broad"), and thus overlaps with constitutional scrutiny.

### 3. Determining the Meaning of Political Speech and whether Government may Regulate it

*WRTL II* also reaffirms that in determining the meaning of a political speech and whether government may regulate it, one looks to the substance of the speech itself. 551 U.S. at 469 (citing *Buckley,* 424 U.S. at 43-44). *WRTL II* all but forecloses considering such factors as intent, *id.* at 467-68, effect, *id.* at 467, 469 & n.5, impact on an election, *id.* at 470-71, what the speaker does *not* say, *see id.* at 471, what the speaker says elsewhere, *id.* at 472, timing, *id.* at 472-73, references to other sources, including sources the speaker prepared, *id.* at 473, or characteristics of the speaker, as opposed to the substance of the speech itself. *See id.* at 469 (citing *Buckley,* 424 U.S. at 43-44). *WRTL II* counsels against using "factor-based standards to define the boundaries of regulable speech[.]" *NCRL III,* 525 F.3d at 283. In other words, *WRTL II* all but forecloses considering context to determine the meaning of political speech and whether government may regulate it. *See* 551 U.S. at 467-73.

### D. Vagueness

### 1. The Order of Questions for Political Committee Status

In addressing whether a jurisdiction may regulate an entity as a political committee,[12] the law requires considering these questions in this order: Does the

---

[12] Or whatever label a jurisdiction uses.

Case 2:10-cv-00669-CNC    Filed 08/05/10    Page 21 of 89    Document 4

entity (1) fall under a political-committee definition that is not unconstitutionally vague and therefore overbroad?  If so, does the entity (2) pass the proper "under the control of a candidate" or major-purpose test?  *See Buckley v. Valeo,* 424 U.S. 1, 74-79 (1976).

## 2. Wisconsin Law is Vague, and therefore Overbroad

Wisconsin's committee/political-committee, "persons other than political committees," and organization definitions are unconstitutionally vague, and therefore overbroad,[13] and the definitions are unconstitutional as applied to WRTL's speech and facially.  Since a narrowing gloss is not an option,[14] Wisconsin may not regulate WRTL as a committee/political committee, "person[] other than [a] political committee[]," or organization *via* this law.  This suffices to conclude the political-committee inquiry.

Wisconsin's vague law does not "provide the kind of notice that will enable ordinary people to understand what conduct it" regulates; furthermore, "it may

---

[13] This is question of law, *Boutilier v. INS,* 387 U.S. 118, 120 (1967) (calling a two-part question including vagueness a "purely legal question"), and questions of law are for the Court to decide.  *E.g., Parks v. Ross,* 52 U.S. 362, 373 (1850) ("It is undoubtedly the peculiar province of the jury to find all matters of fact, and of the court to decide all questions of law").

[14] Federal courts have narrowed the *federal* political-committee definition by narrowing the *federal* expenditure and contribution definitions for entities that are not, or are not yet, political committees.  *See Buckley,* 424 U.S. at 23 n.24 (contribution); *id.* at 80 (expenditure); *FEC v. Survival Educ. Fund,* 65 F.3d 285, 295 (2d Cir. 1995) (contribution).  But that does not mean federal courts may narrow *state* law.  *Infra* Part II.N.

22

authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales,* 527 U.S. 41, 56 (1999) (citing *Kolender v. Lawson,* 461 U.S. 352, 357 (1983)).

### 3.    Why Wisconsin Law is Vague, and therefore Overbroad

Vagueness is unconstitutional not only in speech limits and bans but also in political-committee definitions and in disclosure requirements. *See, e.g., Buckley,* 424 U.S. at 74-81 (addressing vagueness and overbreadth in a political-committee definition and in disclosure requirements).

The language the complaint cites[15] is unconstitutionally vague, and therefore overbroad.

Enforcing such vague law would be like "handing out speeding tickets without 'telling anyone the speed limit.'" *North Carolina Right to Life, Inc. v. Leake,* 525 F.3d 274, 290 (4th Cir. 2008) ("*NCRL III*") (ellipsis and citation omitted).

How is anyone – including a speaker or a law enforcer – to know for sure whether political speech meets any of these criteria? *See Morales,* 527 U.S. at 56 (citing *Kolender,* 461 U.S. at 357). This question goes to the heart of the problem with laws that are vague, and therefore overbroad, especially ones regulating political speech.[16] This is partly why *FEC v. Wisconsin Right to Life, Inc.,* all but forecloses determining the meaning of political speech by considering the context of

---

[15] VC ¶¶ 79-81.

[16] *Supra* Part II.C.2.a.

Case 2:10-cv-00669-CNC   Filed 08/05/10   Page 23 of 89   Document 4

speech, *see* 551 U.S. 449, 474 n.7 (2007) ("*WRTL II*"), *i.e.,* factors such as the purpose, *see id.* at 476 n.8 – or to use the *WRTL II* synonym, *see id.,* "intent" – behind political speech.  *See id.* at 467 (quoting *Buckley v. Valeo,* 424 U.S. 1, 43 (1976)).[17]

These issues confront WRTL *vis-à-vis* all of its speech and will confront WRTL *vis-à-vis* materially similar speech in the future.

● As for the language itself, the phrases "for the purpose of influencing the election or nomination for election[,]" "attempting to influence an endorsement or nomination[,]" and "primarily to influence elections" are unconstitutionally vague and overbroad.  *Buckley,* 424 U.S. at 77; *Landell v. Sorrell,* 382 F.3d 91, 163 n.6 (2d Cir. 2004) (Winter, J., dissenting).[18]  "The breadth of this language is indisputable. Given its ordinary meaning, the language includes the value of the use of phones, computers, offices, rooms in residences or elsewhere, paper, pencils, autos, etc." *Landell,* 382 F.3d at 161 (Winter, J., dissenting).  The phrases are "in substantial

---

[17] *Supra* Part II.C.3.  Telling speakers to raise issues in a state forum before raising them in federal court is a response that goes to standing, *see supra* Part II.A.1.a, or abstention, *see Vermont Right to Life Comm., Inc. v. Sorrell,* 221 F.3d 376, 384-86 (2d Cir. 2000) ("*VRLC I*"), not vagueness, and is not a permissible response to a contention that law infringing First Amendment rights to political speech is vague. *See, e.g., id.* at 385-86; *cf. Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 163 (1969) (Harlan, J., concurring) ("timing is of the essence in politics. It is almost impossible to predict the political future; and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all").

[18] The Second Circuit panel disagreed, 382 F.3d at 136 n.26, and upheld spending limits, *id.* at 106-37, and contribution limits, *id.* at 137-48, but the Supreme Court reversed the panel on both points.  *Randall v. Sorrell,* 548 U.S. 230, 240-46 (2006) (spending); *id.* at 246-62 (contributions).

24

part hopelessly ambiguous[.]" *Id.* at 162 (citing *Buckley,* 424 U.S. at 44, 80); *see also North Carolina Right to Life, Inc. v. Bartlett,* 168 F.3d 705, 712-13 (4th Cir. 1999) ("*NCRL I*"), *cert. denied,* 528 U.S. 1153 (2000). *McConnell v. FEC,* 540 U.S. 93 (2003), does not change this. *See Landell,* 382 F.3d at 162 (Winter, J., dissenting). Besides, candidates, "especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions." *Buckley,* 424 U.S. at 42. So discussing public issues that are also electoral-campaign issues "naturally and inexorably" influences elections, *FEC v. Central Long Island Tax Reform Immediately Comm.,* 616 F.2d 45, 53 (2d Cir. 1980) (*en banc*) (quoting *Buckley,* 424 U.S. at 42 n.50), and "influencing elections" is a "classic form of issue advocacy[.]" *NCRL I,* 168 F.3d at 713.

● Promote-support-attack-oppose ("PASO") and the form thereof at issue here – "supports or condemns" – are similarly vague and overbroad. While *McConnell* did say PASO is not unconstitutionally vague in a term – "federal election activity" – applying to party committees and federal candidates, *compare* 540 U.S. at 170 n.64 *with* 2 U.S.C. §§ 434.e (2002) *and id.* § 441i (2002) (each citing *id.* § 431.20.A), that is different from what is at issue here. Other courts have held parts of PASO are vague and overbroad *vis-à-vis* other speech or other speakers. *See FEC v. Wisconsin Right to Life, Inc.,* 551 U.S. 449, 492 (2007) ("*WRTL II*") (Scalia, J., concurring in part and concurring in the judgment) (calling, *inter alia,* PASO "impermissibly vague"); *id.* at 493 (calling PASO "inherently vague"). One court considered a state law defining "political committee" as any group "the primary or

25

incidental purpose of which is to support or oppose any candidate or to influence or attempt to influence the result of an election." The court held the law "is unconstitutionally vague and overbroad." *NCRL I,* 168 F.3d at 712-13 (ellipsis omitted) (citing *Buckley,* 424 U.S. at 79-80). Another court considered a law requiring disclosure of payments "for the purpose of supporting, opposing, or otherwise influencing the nomination or election of a person to public office." *Center for Individual Freedom v. Carmouche*, 449 F.3d 655, 662-63 (5th Cir. 2006) ("*CFIF I*"). The court's holding was based on the premise that the law is vague and overbroad. *See id.* at 665. And *Buckley* held the phrase "advocating the election or defeat of a candidate" was vague and overbroad. 424 U.S. at 42-44. Since "advocating the election or defeat of a candidate" is more precise than PASO and the form thereof at issue here, they must also be vague and overbroad. *Cf. WRTL II,* 551 U.S. at 493 (Scalia, J., concurring in part and concurring in the judgment) (calling the appeal-to-vote test vague and stating that it "seem[s] tighter" than, *inter alia,* PASO); *NCRL III,* 525 F.3d at 289, 301 (approving "support or oppose" when – after *NCRL III, id.* at 281-86 – its definition included only express advocacy as defined in *Buckley*);[19,20] *New Mexico Youth Organized v. Herrera,* No. CIV 08-

---

[19] Moreover, considering whether speech is "for the purpose of influencing the election or nomination for election" or "attempting to influence an endorsement or nomination" assesses the intent or purpose behind or the effect of political speech to determine its meaning. Considering whether speech PASOs, supports, opposes, or "supports or condemns" comes close to doing the same. *WRTL II* all but forecloses this. *Supra* Part II.C.3. *WRTL II* was not the first time the Court rejected considering intent, purpose, or effect, *see Buckley,* 424 U.S. at 43 (quoting *Thomas,* 323 U.S. at 535), nor was *McConnell* the first time the Court considered the

26

1156 JCH/WDS, order at 24-25 (D.N.M. Aug. 3, 2009) ("*NMYO*")[21] (holding that the First Amendment protects particular ads "that could be seen as attacking the targeted legislators"), *aff'd on other grounds,* ____ F.3d ____, ____, manuscript op. at 13-19 (10th Cir. June 30, 2010).[22]

---

vagueness of parts of PASO. *See Cole v. Richardson,* 405 U.S. 676, 678-85 (1972) (treating oaths to support one's country and "oppose" its enemies as harmless "amenities" merely requiring compliance with other laws, but explaining that "oppose" would be vague elsewhere); *Cramp v. Board of Public Instruction,* 368 U.S. 278, 279 (1971) (holding "support" unconstitutionally vague); *cf. Baggett v. Bullitt,* 377 U.S. 360, 373 (1964) (stating that since some push vague laws to limits, "[w]ell intentioned prosecutors and judicial safeguards do not neutralize the voice of a vague law"). Of course, Wisconsin law is no "amenity" requiring compliance with other laws. Instead, it is law with serious penalties. *See* VC ¶ 19 (citing "civil liabilities and criminal penalties").

[20] A vacated Fourth Circuit panel opinion missed a crucial point about *NCRL III. See Real Truth About Obama, Inc. v. FEC,* 575 F.3d 342, 349-50 (4th Cir. 2009) ("*RTAO*"), *cert. granted and judgment vacated,* 559 U.S. ____, 130 S.Ct. 2371 (2010). In approving "support or oppose" language in 11 C.F.R. § 100.57.a (2005), *vacated, FEC v. EMILY's List,* 581 F.3d 1, 21, 24, 25 (D.C. Cir. 2009), *RTAO* relied on *NCRL III.* However, *NCRL III* addressed *North Carolina's* "support or oppose" definition, 525 F.3d at 289, 301, which after *NCRL III, id.* at 281-86, includes *only* express advocacy as defined in *Buckley.* By contrast, 11 C.F.R. § 100.57.a did not limit "support or oppose" to express advocacy as defined in *Buckley* or define the phrase in any other constitutional way. Indeed, neither FECA nor FEC regulations define "support or oppose" at all. Those reading only *RTAO* may get the misimpression that *NCRL III* gives a green light to regulating whatever supports or opposes or holds that "support or oppose" is inherently *not* vague. *NCRL III* has no such holding.

[21] *Available at* http://www.nmcourt.fed.us/Drs-Web/view-file?full-path-file-name=%2Fdata%2Fdrs%2Fdm%2Fdocuments%2Fndd%2F2009%2F08%2F03%2F0002481726-0000000000-08cv01156.pdf.

[22] *Available at* http://www.ck10.uscourts.gov/opinions/09/09-2212.pdf.

Besides, political parties and many federal candidates' campaigns are filled with political professionals accustomed to, though not necessarily content with, baroque election law. *Cf. McConnell,* 540 U.S. at 170 n.64 (holding that PASO is clear for political parties). PASO and the forms thereof at issue here leave in a quandary those speakers, other than political parties and federal candidates, who want to engage in political speech. They cannot know how far they may go before they are PASOing, or supporting, or condemning. *See WRTL II,* 551 U.S. at 492 (Scalia, J., concurring in part and concurring in the judgment) (calling, *inter alia,* PASO "impermissibly vague"); *id.* at 493 (calling PASO "inherently vague"). As a result, they will hedge and trim their speech out of fear of violating a law that is hard for those outside a party or candidate-campaign apparatus to understand. *See NCRL III,* 525 F.3d at 285-86 (holding a definition of "support or oppose," which is part of PASO, facially unconstitutional); *CFIF I,* 449 F.3d at 662-63, 665; *NCRL I,* 168 F.3d at 712-13 (citing *Buckley,* 424 U.S. at 79-80).

● Furthermore, Wisconsin bases its Section 1.28 requirements on the appeal-to-vote test. *Compare* GAB 1.28.3.a ("terms such as the following *or their functional equivalents*" (emphasis added)) *with WRTL II,* 551 U.S. at 469-70. *WRTL II* rejects a contention that the appeal-to-vote test is vague by noting it applies *only* to electioneering communications as defined in the Federal Election Campaign Act, 2 U.S.C. § 431 *et seq.* ("FECA"). 551 U.S. at 474 n.7. Moreover, *Citizens United* does

28

away with the appeal-to-vote test as a constitutional limit on government power.[23]

What remains from *WRTL II* regarding the appeal-to-vote test is the conclusion that the test *is* unconstitutionally vague, and therefore overbroad. *See id.* at 492-94 (Scalia, J., concurring in part and concurring in the judgment). So *Citizens United* does not just do away with the appeal-to-vote test as a constitutional limit on government power. It renders the test unconstitutionally vague. How is anyone – including a speaker or a law enforcer – to know whether speech has "the functional equivalents" of particular terms? Such a standard is "impermissibly vague[.]" *Id.* at 492. It lacks "the degree of clarity necessary to avoid the chilling of fundamental political discourse[.]" *Id.* at 493. It "provides ample room for debate and uncertainty" about its meaning. *Id.* The appeal-to-vote test

> ultimately depend[s] … upon a judicial judgment (or is it – worse still – a jury judgment?) concerning "reasonable" or "plausible" import that is far from certain, that rests upon consideration of innumerable surrounding circumstances which the speaker may not even be aware of, and that lends itself to distortion by reason of the decisionmaker's subjective evaluation of the importance or unimportance of the challenged speech. In this critical area of political discourse, the speaker[s] cannot be compelled to risk felony [or other] prosecution with no more assurance of impunity than [their] prediction that what [t]he[y] say[] will be found susceptible of some "reasonable interpretation other than as an appeal to vote for or against a specific candidate." Under these circumstances, "many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech – harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks,* 539 U.S. 113, 119 (2003) (citation omitted).

---

[23] *Infra* Part II.G.2.

29

*WRTL II,* 551 U.S. at 493-94 (Scalia, J., concurring in part and concurring in the judgment) (brackets in original omitted).

Therefore, the foregoing[24] are unconstitutionally vague, and therefore overbroad, and are unconstitutional as applied to WRTL's speech and facially.[25]

### E.     Overbreadth: In General

In addition, Wisconsin law is unconstitutional as applied to WRTL's and WRTL-SPAC's speech and – with the exception of two counts[26] – facially.[27]

Wisconsin law fails the appropriate level of scrutiny.

Regardless of the level of scrutiny, the government has the burden of proving law survives scrutiny, *FEC v. Wisconsin Right to Life, Inc.,* 551 U.S. 449, 464 (2007) ("*WRTL II*") (rejecting the FEC's contention that the speaker has the burden of proof under strict scrutiny (citing *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 786 (1978)), *quoted in Citizens United v. FEC,* 558 U.S. ____, ____, 130 S.Ct. 876, 898 (2010); *Nixon v. Shrink Mo. Gov't PAC,* 528 U.S. 377, 387 (2000) (noting that the government must show law survives intermediate scrutiny (quoting *Buckley v. Valeo,* 424 U.S. 1, 25 (1976))), the only interest that suffices to limit campaign finances is the prevention of corruption of candidates or officeholders, or

---

[24] VC ¶¶ 79-81.

[25] Part II.M addresses facial unconstitutionality, including vagueness.

[26] *Infra* Part II.K.

[27] Parts II.E-L address as-applied challenges, and Part II.M addresses facial unconstitutionality, including overbreadth.

30

its appearance,[28] and where "the First Amendment is implicated, the tie [(if there is one)] goes to the speaker, not the censor." *WRTL II,* 551 U.S. at 474. Given this –

---

[28] *See FEC v. National Conservative PAC,* 470 U.S. 480, 496-97 (1985) ("*NCPAC*") (citing *Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290 (1981); *Buckley v. Valeo,* 424 U.S. 1 (1976)); *Citizens Against Rent Control,* 454 U.S. at 297 (referring to candidates and officeholders); *see also Citizens United v. FEC,* 558 U.S. ____, ____, 130 S.Ct. 876, 908-09 (2010) (considering only corruption); *Davis v. FEC,* 554 U.S. ____, ____, 128 S.Ct. 2759, 2770-74 (2008) (same); *FEC v. Wisconsin Right to Life, Inc.,* 551 U.S. 449, 478 (2007) ("*WRTL II*") (same) (quoting *Buckley v. Valeo,* 424 U.S. 1, 45 (1976)); *Randall v. Sorrell,* 548 U.S. 230, 241-42, 244-45, 247-48 (2006) (same); *FEC v. Colorado Republican Fed. Campaign Comm.,* 533 U.S. 431, 441, 444-45, 456 (2001) ("*Colorado Republican II*") (same); *Nixon v. Shrink Mo. Gov't PAC,* 528 U.S. 377, 388-96 (2000) (same); *Colorado Republican Fed. Campaign Comm.,* 518 U.S. 604, 609, 615-18, 623 (1996) ("*Colorado Republican I*") (same); *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 659 (1990) (same), *overruled on other grounds, Citizens United,* 130 S.Ct. at 896-914; *FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 259-60, 263 (1986) ("*MCFL*") (same); *FEC v. National Right to Work,* 459 U.S. 197, 208-10 (1982) (same); *California Med. Ass'n v. FEC,* 453 U.S. 182, 195, 197-99 (1981) (same); *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 353 n.15 (1995) (holding that the "risk of corruption … in … candidate elections … is not present in a popular vote on a public issue" (quoting *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 790 (1978))); *Citizens Against Rent Control,* 454 U.S. at 297 (holding that "*Buckley* does not support limit[]s on contributions to committees formed to favor or oppose ballot measures" (citations omitted)).

"The Court has also upheld restrictions designed to prevent the circumvention of contribution limits, but because those limits were themselves justified by an anticorruption rationale, anti-circumvention is not an independent state interest." *Landell v. Sorrell,* 406 F.3d 159, 169 (2d Cir. 2005) (Walker, J., dissenting from the denial of rehearing and request for rehearing *en banc*) (citing *McConnell,* 540 U.S. at 161)); *see also California Med.,* 453 U.S. at 197-98 (citing *Buckley*). *Colorado Republican II* similarly recognizes that circumvention is part of the interest in preventing corruption or its appearance, *see* 533 U.S. at 456, yet *WRTL II* rejects an anti-circumvention-upon-anti-circumvention rationale, holding that such a "prophylaxis-upon-prophylaxis approach to regulating expression is not consistent with strict scrutiny." 551 U.S. at 479.

31

and given that freedom of speech is the norm, not the exception[29] – if government wants to regulate political speech in ways that case law does not allow, government must prove the law survives scrutiny.

> The absence of prearrangement and coordination of [spending for political speech] with the candidate[s] or [their] agent[s] not only undermines the value of the [spending] to the candidate[s], but also alleviates the danger that [spending] will be … a *quid pro quo* for improper commitments from the candidate[s].

*Citizens United,* 130 S.Ct. at 908 (quoting *Buckley,* 424 U.S. at 47). "[I]ndependent expenditures, including those made by [domestic] corporations [and by extension domestic unions], do not give rise to corruption or the appearance of corruption." *Id.* at 909; *see id.* at 911 (citing 2 U.S.C. § 441e (2002)). Since independent expenditures – *i.e.,* noncoordinated express advocacy as defined in *Buckley,* 424 U.S. at 39-51, 74-81 – are the highest grade of spending for political speech, *cf. id.* at 44 & n.52, 80, by persons government may not regulate as political committees under *Buckley,* 424 U.S. at 74-79, it follows that when it comes to persons other than foreign nationals, *see Citizens United,* 130 S.Ct. at 911 (citing 2 U.S.C. § 441e), no independent spending for political speech "give[s] rise to corruption or the appearance of corruption." *Id.* at 909.

---

[29] *Supra* Part II.C.2.

### F. Overbreadth: The Committee/Political Committee, "Persons other than Political Committees," and Organization Definitions

#### 1. Strict Scrutiny

Strict scrutiny applies to government regulation of entities as political committees. *See Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 658 (1990) (holding that a state requirement that an entity establish a segregated fund "must be justified by a compelling state interest"), *overruled on other grounds, Citizens United v. FEC,* 558 U.S. ____, ____, 130 S.Ct. 876, 896-914 (2010); *Colorado Right to Life Comm., Inc. v. Coffman,* 498 F.3d 1137, 1146 (10th Cir. 2007) ("*CRLC*") (holding that strict scrutiny applies); *North Carolina Right to Life v. Leake,* 525 F.3d 274, 290 (4th Cir. 2008) ("*NCRL III*") (addressing "narrower means"); *cf. Citizens United,* 130 S.Ct. at 897-98 (holding that strict scrutiny applies to a ban on speech and noting the burdens of forming a political committee to do the same speech); *FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 252 (1986) ("*MCFL*") (considering whether a ban on independent expenditures "is justified by a compelling state interest" and noting the burdens of forming a separate segregated fund to do the same speech).[30]

---

[30] On this point, *Austin* is consistent with *Citizens United* and *MCFL.* Bans on express advocacy as defined in *Buckley v. Valeo,* 424 U.S. 1, 44 & n.52, 80 (1976), receive strict scrutiny. *See Citizens United,* 130 S.Ct. at 898 (quoting *Wisconsin Right to Life, Inc.,* 551 U.S. 449, 464 (2007) ("*WRTL II*")); *MCFL,* 479 U.S. at 252 ("compelling state interest"). Bans force such speech into other entities, *cf. Citizens United,* 130 S.Ct. at 897; *MCFL,* 479 U.S. at 254-55, and government may regulate those entities as political committees under particular circumstances. *See Buckley,* 424 U.S. at 74-79. Forcing speech into other entities and regulating them as political committees also receive strict scrutiny. *See Austin,* 494 U.S. at 658.

33

Under strict scrutiny, a court first asks whether there is a "compelling" government interest in regulating the speech. Only if there is does a court ask whether the law is "narrowly tailored to achieve that interest." *FEC v. Wisconsin Right to Life, Inc.,* 551 U.S. 449, 464 (2007) ("*WRTL II*") (citing *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 786 (1978)), *quoted in Citizens United,* 130 S.Ct. at 898; *see also Republican Party of Minn. v. White,* 536 U.S. 765, 774-75 (2002) (citing *Eu v. San Francisco County Democratic Cent. Comm.,* 489 U.S. 214, 222 (1989)).[31]

### 2.    The Burdens of Being a Political Committee

As a matter of *law,* not fact, political-committee status is not only "burdensome[,]" *Citizens United,* 130 S.Ct. at 897, but also "onerous[,]" *id.* at 898; *WRTL II,* 551 U.S. at 477 n.9 (citing *MCFL,* 479 U.S. at 253-55), because political committees "are expensive and subject to extensive regulations." *Citizens United,* 130 S.Ct. at 897. Government may impose far greater burdens on entities it may regulate as political committees under *Buckley v. Valeo,* 424 U.S. 1, 74-79 (1976), than it may impose on other persons. *See MCFL,* 479 U.S. at 251-56. Addressing the burdens of being one type of political committee, the Supreme Court observed they

---

[31] The Seventh Circuit has held scrutiny is a question of law. *Majeske v. City of Chicago,* 218 F.3d 816, 820 (7th Cir. 2000) (citing *Contractors Ass'n of Eastern Pa.,* 91 F.3d 586, 596 (3d Cir. 1996)), *cert. denied,* 531 U.S. 1079 (2001). When the Supreme Court establishes a boundary around government's power, *see, e.g., Citizens United,* 130 S.Ct. at 896-914, then any law reaching that boundary or extending beyond it is unconstitutional as a matter of law, and no factual inquiry is necessary.

34

may create a disincentive for … organizations to engage in political speech. Detailed recordkeeping and disclosure obligations, along with the duty to appoint a treasurer and custodian of the records, impose administrative costs that many small entities may be unable to bear. Furthermore, such duties require a far more complex and formalized organization than many small groups could manage. … Faced with the need to assume a more sophisticated organizational form, to adopt specific accounting procedures, [and] to file periodic detailed reports, … it would not be surprising if at least some groups decided that the contemplated political activity was simply not worth it.

*Id.* at 254-55 (footnote omitted). These are "well-documented and onerous burdens, particularly on small nonprofits." *WRTL II,* 551 U.S. at 477 n.9 (citing *MCFL,* 479 U.S. at 253-55). These requirements are burdensome and onerous *regardless* of whether government bans an entity itself from speaking and says that only an entity's political committee may speak, *see, e.g., Citizens United,* 130 S.Ct. at 897, or whether government requires the entity itself to be a political committee. *See id.* ("Even if a PAC could somehow allow a corporation to speak … that does not alleviate the First Amendment problems"). Because political-committee status is so burdensome and onerous, allowing speech only if an entity becomes or forms a political committee is like banning the entity's speech. *See id.* Political-committee requirements are burdensome and onerous even if they include "only" – so to speak – (1) registration, including treasurer-designation, (2) recordkeeping, or (3) extensive reporting requirements yet not (4) limits or (5) source bans on contributions received. *See id.* at 897-98 (mentioning (1), (2), and (3), but not (4) or (5)). Similar state requirements, such as Wisconsin's,[32] are also a "significant

---

[32] VC ¶¶ 27, 29.

regulatory burden." *NCRL III,* 525 F.3d at 286 (citing *North Carolina Right to Life, Inc. v. Bartlett,* 168 F.3d 705, 712 (4th Cir. 1999) (*"NCRL I"*), *cert. denied,* 528 U.S. 1153 (2000)). Such onerous restrictions may not be prior restraints on speech, yet by giving government the power to license speech, they in effect are prior restraints. *Cf. Citizens United,* 130 S.Ct. at 895-96. Wisconsin *via* its committee/political-committee and "persons other than political committees" definitions imposes (1), (2), and (3) on entities such as WRTL. Although it is beyond the point, Wisconsin law also imposes (4) and (5) on committees/political committees and "persons other than political committees," though not on "organizations."[33] Wisconsin *via* Section 1.91 imposes (1), (2), and (3) on entities such as WRTL.

### 3. The "Under the Control of a Candidate" and Major Purpose Tests

With political-committee burdens in mind, *Buckley* applies the unambiguously-campaign-related principle, *New Mexico Youth Organized v. Herrera,* ____ F.3d ____, ____, manuscript op. at 13 (10th Cir. June 30, 2010) (*"NMYO"*) (quoting *Buckley,* 424 U.S. at 79);[34] *NCRL III,* 525 F.3d at 287, and establishes that the federal government may regulate an entity as a political

---

[33] VC ¶¶ 27, 29.

[34] *Available at* http://www.ck10.uscourts.gov/opinions/09/09-2212.pdf. This principle remains in place after *Citizens United. NMYO,* ____ F.3d at ____ n.4, manuscript op. at 13 n.4.

committee only if (1) it is "under the control of a [federal[35]] candidate" or candidates or (2) "the major purpose" of the entity is "the nomination or election of a [federal[36]] candidate" or candidates. 424 U.S. at 79, *followed in McConnell v. FEC,* 540 U.S. 93, 170 n.64 (2003), *and MCFL,* 479 U.S. at 252 n.6, 262; *Brownsburg Area Patrons Affecting Change v. Baldwin,* 137 F.3d 503, 505 n.5 (7th Cir. 1998) ("to fulfill the purposes of [FECA] [the definition of PACs] need only encompass organizations ... the major purpose of which is the nomination or election of a candidate [*i.e.,* express advocacy]" (brackets and ellipsis in original) (quoting *Buckley,* 424 U.S. at 79)); *CRLC,* 498 F.3d at 1153-54 (noting that *McConnell* did not change the test (citations omitted)); *NCRL III,* 525 F.3d at 287-90.[37]

---

[35] *FEC v. Florida for Kennedy Comm.,* 681 F.2d 1281, 1287 (11th Cir. 1982); *FEC v. Machinists Non-Partisan Political League,* 655 F.2d 380, 394-96 (D.C. Cir.), *cert. denied,* 454 U.S. 897 (1981). *Buckley* was considering the term "candidate" under FECA, which defines "candidate" as a federal candidate. 2 U.S.C. § 431.2.

[36] *FEC v. EMILY's List,* 581 F.3d 1, 16 n.15 (D.C. Cir. 2009) (quoting *Buckley,* 424 U.S. at 79); *Real Truth About Obama, Inc. v. FEC,* 575 F.3d 342, 348 (4th Cir. 2009) ("*RTAO*") (quoting *Buckley,* 424 U.S. at 79-80), *cert. granted and judgment vacated,* 559 U.S. ____, 130 S.Ct. 2371 (2010).

[37] A common abbreviation for "the nomination or election of a candidate" or candidates is "campaign activity." *See, e.g., Political Committee Status,* 72 FED. REG. 5595, 5597 (FEC 2007) (referring to "campaign activity (*i.e.,* the nomination or election of a [f]ederal candidate)"); *compare Buckley,* 424 U.S. at 78-80, *with MCFL,* 479 U.S. at 252-53 & n.6, 262. It is important not to confuse the ordinary understanding of "campaign activity" with how the Court uses the phrase. In the ordinary understanding, "campaign activity" may include both activity that is, and activity that is not, about "the nomination or election of a candidate" or candidates. After all, some "campaigns" are about issues and are not about "the nomination or election of a candidate" or candidates. *Cf. North Carolina Right to Life, Inc. v. Bartlett,* 168 F.3d 705, 712-13 (4th Cir. 1999) ("*NCRL I*") (holding that "the primary or incidental purpose of which is to support or oppose any candidate ... or to

37

These two tests address whether a *definition* through which government imposes political-committee burdens is constitutional. *Brownsburg,* 137 F.3d at 505 n.5 (holding that *Buckley* limits a political-committee *definition* to organizations passing the major-purpose test); *Unity08 v. FEC,* 596 F.3d 861, 867 (D.C. Cir. 2010) (noting that the "under the control of a candidate" and major-purpose tests limit the political-committee *definition* (quoting *FEC v. Machinists Non-Partisan Political League,* 655 F.2d 380, 392, 395-96 (D.C. Cir.), *cert. denied,* 454 U.S. 897 (1981))); *NCRL III,* 525 F.3d at 288-89 (considering whether a political-committee *definition* has the major-purpose test); *CRLC,* 498 F.3d at 1139 (holding a political-committee *definition* unconstitutional because it lacks the major-purpose test); *id.* at 1154-55 (applying the major-purpose test to a political-committee *definition*).[38]

---

influence or attempt to influence the result of an election" includes both speech that is, and speech that is not, express advocacy), *cert. denied,* 528 U.S. 1153 (2000); *id.* at 708-09 (stating that "issue advocacy may influence an election even though it does not expressly advocate" (citing *Virginia Soc'y for Human Life, Inc. v. Caldwell,* 152 F.3d 268, 270 (4th Cir. 1998) ("*VSHL I*")); *FEC v. Central Long Island Tax Reform Immediately Comm.,* 616 F.2d 45, 53 (2d Cir. 1980) (*en banc*) ("Public discussion of public issues which are also campaign issues readily and often unavoidably draws in candidates and their positions, their voting records and other official conduct. Discussions of those issues, and as well more positive efforts to influence public opinion on them, tend naturally and inexorably to exert some influence on voting at elections" (quoting *Buckley,* 424 U.S. at 42 n. 50)). However, as the Court uses "campaign activity," it is an abbreviation for, and therefore synonymous with, "the nomination of election of a candidate" or candidates. For clarity's sake, the latter is more precise and provides the bright-line definition the Constitution requires for regulating core First Amendment activity. *See FEC v. GOPAC, Inc.,* 917 F. Supp. 851, 861 (D.D.C. 1996) (citing *Buckley,* 424 U.S. at 42).

[38] After *CRLC,* another Tenth Circuit panel incorrectly said a challenge to political-committee status is a challenge to political-committee *disclosure requirements,* so the panel applied exacting scrutiny. *NMYO,* _____ F.3d at _____, manuscript op. at 12

38

### 4. The Tests as a Shield against Regulation as a State Political Committee

*Buckley* also shields entities that *state* law defines as political committees. *See, e.g., NCRL III,* 525 F.3d at 287-90; *CRLC,* 498 F.3d at 1153-54. For a state to regulate entities as state political committees, the entities must pass the proper "under the control of a candidate" or major-purpose test. *See, e.g., NCRL III,* 525 F.3d at 286 (noting the unconstitutional burdens included appointing a treasurer, filing a statement of entities (*i.e.,* registering), identifying affiliation, recordkeeping requirements, and extensive disclosure requirements).[39]

---

(citing *Buckley,* 424 U.S. at 64; *Doe v. Reed,* 561 U.S. ____, ____, 130 S.Ct. 2811, 2818 (2010)), *available at* http://www.ck10.uscourts.gov/opinions/09/09-2212.pdf; *see generally infra* Part II.G.1. However, given this conflict between circuit panels, the *earlier* panel opinion controls, as the Tenth Circuit established in *Haynes v. Williams,* 88 F.3d 898, 900 n.4 (10th Cir. 1996) (citations omitted). Moreover, the *Buckley* and *Reed* pages *NMYO* cites address scrutiny for disclosure requirements, not a political-committee definition. Even if the *Buckley* page addressed scrutiny for a political-committee definition, which it did not, *Austin, Citizens United,* and *MCFL* – being subsequent *Supreme Court* opinions – would control *Buckley,* and establish that strict scrutiny applies. *See supra* Part II.F.1.

[39] With varying degrees of precision, other courts have recognized the major-purpose test. *See, e.g., New Mexico Youth Organized v. Herrera,* ____ F.3d ____, ____, manuscript op. at 14 (10th Cir. June 30, 2010) ("*NMYO*") ("organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate" (quoting *Buckley,* 424 U.S. at 79)), *available at* http://www.ck10.uscourts.gov/opinions/09/09-2212.pdf; *Unity08 v. FEC,* 596 F.3d 861, 867 (D.C. Cir. 2010) ("the statute 'need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate'" (quoting *Buckley,* 424 U.S. at 79)); *FEC v. EMILY's List,* 581 F.3d 1, 16 n.15 (D.C. Cir. 2009) ("groups ... whose 'major purpose' involves federal elections" (quoting *Buckley,* 424 U.S. at 79)); *Real Truth About Obama, Inc. v. FEC,* 575 F.3d 342, 348, 350-51 (4th Cir. 2009) ("*RTAO*") ("Supreme Court precedent allows for the regulation of contributions to and expenditures by PACs that are narrowly defined as having 'the major purpose' of expressly advocating 'the

39

Furthermore, government may not cleverly draft or revise its law to impose burdens such as (1) registration and termination requirements, (2) recordkeeping requirements, or (3) extensive reporting requirements[40] on entities *in a capacity other than as a political committee* when the entities do not pass the proper "under the control of a candidate" and major-purpose tests. *See Broward Coal. of Condos., Homeowners Ass'ns & Cmty. Orgs., Inc. v. Browning,* No. 08-445, 2009 WL 1457972 at *7-8 (N.D. Fla. May 22, 2009) (summary-judgment order striking down a definition of "electioneering communications organization" (citing FLA. STAT.

---

election or defeat of a clearly identified candidate for federal office'" (brackets omitted) (quoting *Buckley,* 424 U.S. at 79-80)), *cert. granted and judgment vacated,* 559 U.S. ___, 130 S.Ct. 2371; *California Pro-Life Council v. Getman*, 328 F.3d 1088, 1101 n.16 (9th Cir. 2003) ("*CPLC I*") (considering whether political-committee disclosure requirements applied to "organizations whose major purpose is not campaign advocacy" (quoting *MCFL*, 479 U.S. at 252-53)); *Akins v. FEC,* 146 F.3d 1049, 1050 (D.C. Cir. 1998) (Silberman, J., concurring) (noting that "the Supreme Court's definition of political committee … requires that the organization have as its 'major purpose … the nomination or election of a candidate[]'" (second ellipsis in original) (quoting *Buckley,* 424 U.S. at 79)); *FEC v. Survival Educ. Fund,* 65 F.3d 285, 295 (2d Cir. 1995) (quoting *Buckley,* 424 U.S. at 79, as limiting "political committee" to "organizations 'under the control of a candidate or the major purpose of which is the nomination or election of a candidate'"); *FEC v. Florida for Kennedy Comm.,* 681 F.2d 1281, 1287 (11th Cir. 1982) (articulating the major-purpose test (quoting *Buckley,* 424 U.S. at 79)); *FEC v. Machinists Non-partisan Political League,* 655 F.2d 380, 392 (D.C. Cir.) (noting that *Buckley* employed the major-purpose test to define "[p]olitical committee … for the purpose of 'focusing precisely' FECA's broadly worded provisions on 'the narrow aspect of political association' which could constitutionally be restricted" (quoting *Buckley,* 424 U.S. at 79)), *cert. denied*, 454 U.S. 897 (1981); *United States v. National Comm. for Impeachment*, 469 F.2d 1135, 1141-42 (2d Cir. 1972).

[40] *Supra* Part II.F.2.

Case 2:10-cv-00669-CNC   Filed 08/05/10   Page 40 of 89   Document 4

§ 106.011.19 (2006));[41] *Broward,* 2008 WL 4791004 at *12-13 (N.D. Fla. Oct. 29, 2008) (same in preliminary-injunction order), *clarified on other grounds,* 2008 WL 4878917 (N.D. Fla. Nov. 2, 2008);[42] *National Right to Work Legal Def. & Educ. Found., Inc. v. Herbert,* 581 F. Supp.2d 1132, 1152-54 (D. Utah 2008) (striking down a definition of "political issues committee"). Such entities have a First Amendment right to be free of these burdens. *See MCFL,* 479 U.S. at 254-56; *Buckley,* 424 U.S. at 79; *NCRL III,* 525 F.3d at 286; *CRLC,* 498 F.3d at 1153-54; *see generally Citizens United,* 130 S.Ct. at 897-98.[43] Government may not abrogate this right through clever drafting or revision. It "cannot foreclose the exercise of constitutional rights by mere labels." *NAACP v. Button,* 371 U.S. 415, 429 (1963), *followed in FEC v. Colorado Republican Fed. Campaign Comm.,* 518 U.S. 604, 622 (1996) ("*Colorado Republican I*"). As for (4) limits and (5) source bans on donations received by persons government may *not* regulate as political committees, government may regulate such speech only to the limited extent it may regulate donations received by persons that the jurisdiction in question may *not* regulate as political committees under *Buckley,* 424 U.S. at 74-79.

---

[41] PRELIM. INJ. MOT. Exh. 1.

[42] PRELIM. INJ. MOT. Exh. 2.

[43] A Ninth Circuit panel missed this point and lumped full-fledged political-committee disclosure requirements and other disclosure requirements into one constitutional-scrutiny analysis. This panel contradicted a previous Ninth Circuit panel. A subsequent Ninth Circuit panel compounded the confusion. *Infra* Part II.G.1.

While the major-purpose test may make enforcement or prosecution more burdensome, because government must glean the "major purpose of the organizations" it alleges are political committees, *United States v. National Comm. for Impeachment*, 469 F.2d 1135, 1142 (2d Cir. 1972), when they are not under the control of a candidate or candidates, the major-purpose test is the law.

### 5. The Tests in Wisconsin

For Wisconsin to regulate an entity as a political committee, it must be under the control of a candidate or candidates for state or local office *in Wisconsin,* or the major purpose of the entity must be the nomination or election of a candidate or candidates for state or local office *in Wisconsin.* Why? Because the *Federal* Election Campaign Act – in regulating as *federal* political committees those entities that are under the control of *federal* candidates and those entities with the major purpose of nominating or electing *federal* candidates, including *federal* candidates in Wisconsin – pre-empts state law. 2 U.S.C. § 453.a (2002); *Bunning v. Kentucky,* 42 F.3d 1008, 1012 (6th Cir. 1994) (considering disclosure, including reporting (quoting S. CONF. REP. No. 1237, 93d Cong., 2d Sess. (1974))); *Teper v. Miller,* 82 F.3d 989, 999 (11th Cir. 1996) (Carnes, J., concurring). Given states' sovereignty over their own, though not other states', elections,[44] what remains after pre-emption for *each state* to regulate as *state* political committees is organizations that are under the control of candidates *for state or local office in that state* and organizations that have the

---

[44] *Supra* Part II.C.2.b.

Case 2:10-cv-00669-CNC   Filed 08/05/10   Page 42 of 89   Document 4

major purpose of nominating or electing candidates *for state or local office in that state.*[45]

### 6. Applying the "Under the Control of a Candidate" Test

Determining whether an entity is "under the control of a candidate" or candidates for state or local office in Wisconsin is straightforward, and WRTL is under no such control. *Cf. NMYO,* \_\_\_\_ F.3d at \_\_\_\_, manuscript op. at 14 (citing

---

[45] One should not confuse the test for whether an entity was an *MCFL* corporation with the test for whether government may regulate the entity as a political committee. *See FEC v. Massachusetts Citizens for Life, Inc.* 479 U.S. 238, 262 (1986) ("*MCFL*") (noting that if an *MCFL* corporation passes the major-purpose test, then "the corporation would be … a political committee" (citing *Buckley,* 424 U.S. at 79 (holding that "political committee" need only encompass entities passing the "under the control of a candidate" or major-purpose test))).

The former test asked whether an incorporated entity had particular features. If so, it had a First Amendment right to do independent expenditures and electioneering communications, even if the jurisdiction constitutionally banned other corporations – and perhaps also, unions – from doing the same. *McConnell v. FEC,* 540 U.S. 93, 209-11 (2003), *overruled on other grounds, Citizens United v. FEC,* 558 U.S. \_\_\_\_, \_\_\_\_, 130 S.Ct. 876, 896-914 (2010); *MCFL,* 479 U.S. at 256-65; *FEC v. National Rifle Ass'n of Am.,* 254 F.3d 173, 187-93 (D.C. Cir. 2001); *North Carolina Right to Life, Inc. v. Bartlett,* 168 F.3d 705, 713-14 (4th Cir. 1999) ("*NCRL I*"), *cert. denied,* 528 U.S. 1153 (2000); *Minnesota Citizens Concerned for Life v. FEC,* 113 F.3d 129, 130-31, 133 (8th Cir. 1997) ("*MCCL*"); *FEC v. Survival Educ. Fund, Inc.,* 65 F.3d 285, 290-93 (2d Cir. 1995); *Day v. Holahan,* 34 F.3d 1356, 1363-65 (8th Cir. 1994), *cert. denied,* 513 U.S. 1127 (1995). This test established an exception to any ban on corporate independent expenditures or electioneering communications. *See, e.g.,* 2 U.S.C. § 441b.a, 441b.b.2 (2002). However, under *Citizens United,* bans on such speech by domestic corporations and domestic unions are unconstitutional. *See* 130 S.Ct. at 896-914. *MCFL* corporation status no longer serves any constitutional purpose.

The latter test applies regardless of whether the entity is incorporated and asks whether the entity falls under a political-committee definition that is not unconstitutionally vague and, if so, whether the entity passes the proper "under the control of a candidate" or major-purpose test.

43

*Buckley,* 424 U.S. at 79); *Unity08,* 596 F.3d at 867; *FEC v. Florida for Kennedy Comm.,* 681 F.2d 1281, 1287 (11th Cir. 1982) (holding that under *Buckley* "efforts to extend jurisdiction over … a draft group not under the control of a candidate must fail"); *Machinists Non-Partisan Political League,* 655 F.2d at 394-96.[46]

## 7. Applying the Major Purpose Test

Determining whether an entity passes the major-purpose test is also straightforward. The test asks what *the* major purpose of an entity is, not whether something is *a* major purpose. *MCFL,* 479 U.S. at 252 n.6, 262; *Buckley,* 424 U.S. at 79; *NCRL III,* 525 F.3d at 287-89, 302-04. And "major" is the root of "majority," which means more than half. Thus, an entity can have only one major purpose. *See MCFL,* 479 U.S. at 252 n.6 (referring to "the major purpose" of an entity and "its organizational purpose," not purposes).

> In *MCFL,* the Court suggested two methods to determine an organization's "major purpose": (1) examination of the organization's central organizational purpose; or (2) comparison of the organization's independent [expenditures] with overall spending to determine whether the preponderance of [spending is] for express advocacy or contributions to candidates. 479 U.S. at 252 n.6 (noting that MCFL's "central organizational purpose was issue advocacy, although it occasionally engaged in activities on behalf of political candidates"); *see id.* at 262 (noting that "should MCFL's independent [expenditures] become so extensive that the organization's major purpose may be regarded as [the nomination or election of a candidate], the corporation would be classified as a political committee").

*CRLC,* 498 F.3d at 1152 (brackets omitted).

---

[46] Although it is not material, WRTL is not under the control of *any* candidate or candidates.

44

In other words, the first method considers how the entity has *articulated* its mission in its organizational documents, *see MCFL,* 479 U.S. at 241-42, 252 n.6 (concluding based on an entity's articles of incorporation that its central organizational purpose was issue advocacy, not the nomination or election of federal candidates), or in public statements, *FEC v. GOPAC, Inc.,* 917 F. Supp. 851, 859 (D.D.C. 1996), and the second method considers whether, in *carrying out* its mission, the entity spends the majority, which is what "preponderance" means, of its money on contributions to candidates or on independent expenditures[47] for candidates, *CRLC,* 498 F.3d at 1152, *followed in NMYO,* ____ F.3d at ____, manuscript op. at 16; *NCRL III,* 525 F.3d at 289,[48] in the jurisdiction in question.

---

[47] Meaning express advocacy as defined in *Buckley* and not coordinated with a candidate, the candidate's agents, the candidate's committee, or a party, which is the standard under the Constitution. *See* 424 U.S. at 39-51, 74-81; *McConnell,* 540 U.S. at 219-23; *cf.* 2 U.S.C. § 431.17 (2002).

[48] *Buckley* and *MCFL* references to "primarily organized" and "primary objective" are synonymous with "the major purpose." *See MCFL,* 479 U.S. at 262; *Buckley,* 424 U.S. at 79 & n.107; *see also NCRL III,* 525 F.3d at 287-90. In the ordinary understanding of "primary" – that is, first – a purpose of an entity can be its primary purpose without being the major purpose. However, that is not how the Court uses "primarily" and "primary" here. "Primarily" and "primary" are "major," *i.e.,* more than half, as the Court uses the words. *See MCFL,* 479 U.S. at 262; *Buckley,* 424 U.S. at 79 & n.107; *NMYO,* ____ F.3d at ___, manuscript op. at 15 ("'operated primarily' language would need to satisfy the major[-]purpose test, because this sets the lower bounds for when regulation as a political committee is constitutionally permissible" (citing *NCRL III,* 525 F.3d at 288, 289)). Therefore, it does not suffice under the major-purpose test that an entity's purpose be its primary purpose in the ordinary sense of "primary." The purpose must be *the* major purpose of the entity. For clarity's sake, "the major purpose" is more precise.

45

Applying these two methods here reveals WRTL does not have the major purpose of nominating or electing a candidate or candidates for state or local office in Wisconsin: (1) It has not indicated this in its organizational documents or in its public statements, and (2) it does not spend the majority of its money on contributions to, or independent expenditures for, such candidates.[49]

### 8. What the "Under the Control of a Candidate" and Major Purpose Tests Do Not Ask

Given *Buckley,* 424 U.S. at 79, it cannot be that what remains after preemption for each state to regulate is entities that are under the control of a candidate or candidates for state or local office *in any states* or whose major purpose is the nomination or election of a candidate or candidates for state or local office *in any states*. This would allow states to trample each others' jurisdiction, which makes no more sense than allowing state encroachment on the Federal Election Campaign Act, 2 U.S.C. § 431 *et seq.* ("FECA").

Moreover, it is important to recognize that the major-purpose test does not ask whether the major purpose of the entity *in Wisconsin* is the nomination or election of state or local candidates in Wisconsin. Instead, it focuses on the entire entity *in Wisconsin and elsewhere* and asks whether the major purpose of the entire entity is the nomination or election of state or local candidates in Wisconsin.

---

[49] Although it is not material, WRTL does not have the major purpose of nominating or electing *any* candidate or candidates. It has not indicated this in its organizational documents or in its public statements. Nor does it spend the majority of its money on contributions to, or independent expenditures for, *any* candidate or candidates.

46

Adopting a "major purpose in Wisconsin" test would in effect mean that every jurisdiction could adopt a "major purpose in ____" test, so an entity could have multiple major purposes. It could have the major purpose of nominating or electing a candidate or candidates for state or local office in Wisconsin. It could have the same major purpose in Iowa, Illinois, etc., through 50 states and all the territories. And once an entity can have "the major purpose" in more than one jurisdiction, there is no reason that states and territories are the stopping point. There is also every county, city, town, and village in the country that regulates entities as political committees.

However, an entity can have only one major purpose. *NCRL III,* 525 F.3d at 303; *see MCFL,* 479 U.S. at 252 n.6 (referring to "the major purpose" of an entity and "its organizational purpose," not purposes); *Buckley,* 479 U.S. at 79 (referring to "organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate").

Holding otherwise would allow any state, territory, county, city, town, or village in the country to limit political speech in Wisconsin. Suppose that an entity wants to make contributions and independent expenditures in Wisconsin plus multiple states, territories, counties, cities, towns, or villages. Suppose further that the entity passes the "major purpose in ____" test in all those jurisdictions, and that one of those jurisdictions has much lower limits on contributions received than all the rest, including Wisconsin. Or suppose that one jurisdiction has contribution-source bans more stringent than all the rest, including Wisconsin. To comply with

47

the contribution limits and contribution-source bans in all the jurisdictions, the entity will have to comply with the lowest limits and most stringent bans. As a result, the one jurisdiction will control the entity everywhere else, including Wisconsin.

From the jurisdictions' perspective, this allows one jurisdiction to trample on all other jurisdictions. The one jurisdiction can restrict political speech in Wisconsin beyond the wishes of the people of Wisconsin. This runs afoul of the principle that the "First Amendment affords the broadest protection to … political expression … 'to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Buckley,* 424 U.S. at 14 (quoting *Roth v. United States,* 354 U.S. 476, 484 (1957)).

From the entity's perspective, this allows every jurisdiction where the entity passes the "major purpose in ____" test to regulate the entity as a political committee. This is no better than having a major-purpose test that asks whether the entity has the major purpose *in any states.* Every jurisdiction could saddle the entity with political-committee burdens.

To give one additional illustration of where the "major purpose in ____" test will lead: Suppose that a Wisconsin-based entity – a business corporation, a union, or an educational entity – engages in a wide range of activities in Wisconsin. Perhaps it employs Wisconsonites, represents Wisconsin employees, or provides educational opportunities for Wisconsin children. Suppose further that *just one time,* this Wisconsin entity legally contributes just enough money to, or does just

48

enough independent expenditures for, a candidate for state or local office in another state, territory, county, city, town, or village to cross the political-committee threshold there. *Cf.* 2 U.S.C. § 431.4 (2002) ($1000 political-committee threshold under FECA); OHIO REV. CODE § 3517.10.D.1 (2006) ($0 political-action-committee or political-contributing-entity threshold under Ohio law). Suppose still further that this is the entity's only activity in the other state, territory, county, city, town, or village. Under the "major purpose in ____" test, this Wisconsin entity will have spent the majority of the money it spends in the other jurisdiction on contributions to, or independent expenditures for, state or local candidates there. Thus, the entity will pass the "major purpose in ____" test in the other jurisdiction, *cf. MCFL,* 479 U.S. at 262 (stating that an entity will be a political committee if its independent expenditures become so extensive that the entity passes the major-purpose test (citing *Buckley,* 424 U.S. at 79)), even though the amount of money the entity spent in the other jurisdiction is a tiny fraction of what the entity spent overall.[50]

---

[50] For less-restrictive means than regulating entities as political committees, see *infra* Part II.F.9. Plaintiffs submit that contrary to a district court's denial of a temporary restraining order, there is nothing "pernicious" here. *National Organization for Marriage v. McKee,* 666 F. Supp.2d 193, 210 n.96 (D. Me. 2009). It is true that the major-purpose test may allow an organization that is active in many jurisdictions not to be a political committee in any jurisdiction, *see id.,* yet this follows from the twin principles that (1) each jurisdiction may regulate its own elections and (2) an organization may have only one major purpose. *See supra* Parts II.C.2, II.F.7. Besides, the fact that it is unconstitutional to regulate an entity as a political committee does not mean it is unconstitutional to regulate any political speech the entity does. *See infra* Part II.G.1. Moreover, the Constitution does not limit such regulation to "one-time reporting." 666 F. Supp.2d at 208. Reporting

49

### 9. Applying Strict Scrutiny

Wisconsin lacks a compelling interest in regulating entities such as WRTL as political committees – meaning, here, committees/political-committees, "persons other than political committees," or organizations – because they are neither under the control of, nor do they have the major purpose of nominating or electing, candidates for state or local office in Wisconsin. In the alternative, Wisconsin's committee/political-committee, "persons other than political committees," and organization definitions are not narrowly tailored, because they let Wisconsin regulate entities such as WRTL as committees/political committees, "persons other than political committees," or organizations when they are neither under the control of, nor have the major purpose of nominating or electing, candidates for state or local office in Wisconsin. *See NCRL III,* 525 F.3d at 290 (calling a political-committee definition "vague" and addressing "narrower means" when the definition regulated as political committees entities that passed neither the "under the control of a candidate" test nor the major-purpose test); *CRLC,* 498 F.3d at 1146 (holding that strict scrutiny applies and then addressing the tests). In fact, an entity can be

---

may occur during reporting periods when regulable political speech occurs, however many times that is. One difference between such reporting and full-fledged political-committee reporting is that the former occurs when regulable speech occurs, while the latter occurs during all reporting periods. *Compare* 2 U.S.C. § 434.c.1-2, 434.g (2002) (independent-expenditure reports) *and id.* § 434.f.1 (electioneering-communications reports) *with id.* § 434.a.2-4 (political-committee reports); 11 C.F.R. § 109.10.b (2003). Another difference is what government may require reports include. *Compare* 2 U.S.C. § 434.c.1-2, 434.g *and id.* § 434.f.2 *with id.* § 434.a, b, e. And that is just reporting requirements. *See, e.g., id.* § 432 (2004), 433 (1980).

a Wisconsin committee/political committee, "person[] other than [a] political committee[]," or organization by spending less – far less – than half its money on contributions to or independent expenditures for candidates for state or local office in Wisconsin. An entity, no matter how large its budget, becomes a committee/political committee by receiving "contributions" exceeding $25 and making "disbursements" exceeding $25 in a calendar year. WIS. STAT. § 11.05.1. Under Sections 1.28 and 1.91, the threshold is the same. *See* GAB § 1.28.2 ("the applicable requirements of ch. 11., Stats."); *id.* § 1.91.3. This is an insubstantial amount, especially compared to WRTL's budget. *See Buckley,* 424 U.S. at 79 & n.105 (applying the "under the control of a candidate" and major-purpose tests to a political-committee definition with a $1000 threshold); *CRLC,* 498 F.3d at 1154 (striking down Colorado's major-purpose test as applied to CRLC's speech, because $200 was insubstantial compared to CRLC's overall budget (quoting and affirming *Colorado Right to Life Committee, Inc. v. Davidson,* 395 F. Supp.2d 1001, 1021 (D. Colo. 2005))); *NMYO,* ____ F.3d at ____, manuscript op. at 17-18 (striking down a $500 threshold); *Volle v. Webster*, 69 F. Supp.2d 171, 174-77 (D. Me. 1999) (striking down a $50 threshold as applied to the speech of an individual and his business); *cf. Buckley,* 424 U.S. at 19 & n.18.

51

Therefore, Wisconsin's committee/political-committee, "persons other than political committees," and organization definitions are unconstitutional as applied to WRTL's speech.[51]

If Wisconsin wanted to regulate, for example, spending for political speech by persons it may *not* regulate as political committees under *Buckley,* 424 U.S. at 74-79, then it could, subject to further inquiry, *see, e.g., Citizens United,* 130 S.Ct. at 915-16 (giving an example of when disclosure is unconstitutional), use the less-restrictive means, *id.* at 915 (citing *MCFL,* 479 U.S. at 262), of requiring burdensome yet non-"onerous" disclosure, *id.* at 898; *WRTL II,* 551 U.S. at 477 n.9 (citing *MCFL,* 479 U.S. at 253-55), of (1) express advocacy as defined in *Buckley,*

_____

[51] WRTL does not contend in Part II.F that the disclosure requirements for committees/political-committees, "persons other than political committees," or organizations are unconstitutional.  Rather, the challenge in Part II.F is to the committee/political-committee, "persons other than political committees," and organization definitions, through which Wisconsin unconstitutionally imposes full-fledged political committee burdens.  *Supra* Part II.3; *infra* Part II.G.1.

It is true that *SpeechNow.org v. FEC* – which is confusing, *see infra* Part II.G.1 – applies exacting scrutiny to political-committee disclosure requirements.  599 F.3d 686, 696-98 (D.C. Cir. 2010) (*en banc*), *pet. for cert. filed,* (U.S. undated), *available at* http://www.scotusblog.com/wp-content/uploads/2010/07/SpeechNow-petition-7-23-10.pdf.  However, the political-committee definition *is* constitutional as applied to SpeechNow's speech, because, for example, the speaker *passes* the major-purpose test.  *See SpeechNow,* No. 1:08-cv-00248, COMPL. ¶¶ 7, 47 (D.D.C. Feb. 14, 2008), *available at* http://www.fec.gov/law/litigation/speechnow_complaint.pdf.  Thus, *SpeechNow* properly reaches the political-committee disclosure requirements.  In this action, however, the committee/political-committee, "persons other than political committees," and organization definitions are *un*constitutional as applied to WRTL's speech, so the committee/political-committee, "persons other than political committees," and organization disclosure requirements are unnecessary to consider.

52

424 U.S. at 44 & n.52, 80, *i.e.,* independent expenditures as defined in *Buckley, id.* at 39-51, 74-81, *vis-à-vis* state or local office in Wisconsin or (2) electioneering communications as defined in FECA having a clearly identified candidate for state or local office in Wisconsin. *See Citizens United,* 130 S.Ct. at 914-16 (electioneering communications as defined in FECA); *MCFL,* 479 U.S. at 262 (express advocacy (citing 2 U.S.C. § 434.c)); *Buckley,* 424 U.S. at 80-81 (express advocacy).[52] Wisconsin does not *have to* do this though. No jurisdiction *has to* regulate absolutely, positively everything that it may regulate. But whatever course Wisconsin chooses, it may impose political-committee burdens *only* on entities it may regulate as full-fledged political committees. *See, e.g., Brownsburg,* 137 F.3d at 505 n.5.

Nevertheless, Wisconsin regulates entities such as WRTL as committees/political committees, "persons other than political committees," or organizations. When it regulates them as committees/political committees or "persons other than political committees," as opposed to organizations, it thereby imposes limits (and source bans) on donations they receive.[53] Defendants or others may assert that:

- Some contribution limits (or contribution-source bans) are constitutional.

---

[52] Government must base disclosure on the nature of the speech, not the nature of the speaker. *See NCRL III,* 525 F.3d at 290.

[53] VC ¶ 27, 29.

- When particular limits (or source bans) are constitutional, they necessitate a jurisdiction's knowing the sources of the entities' money, and

- Unless a jurisdiction may impose full-fledged political-committee burdens on such entities, the entities will be able to engage in political speech in the jurisdiction with money beyond the limits (or with money from banned sources).

However, there is a less-restrictive means. Instead of imposing full-fledged political-committee burdens on persons the jurisdiction may not regulate as political committees under *Buckley,* 424 U.S. at 74-79, the jurisdiction may require that the entities use a reasonable accounting method to show they pay for political speech *that the jurisdiction may regulate* with money complying with the jurisdiction's *constitutional* contribution limits (or *constitutional* contribution-source bans). *See EMILY's List v. FEC,* 581 F.3d 1, 12 (D.C. Cir. 2009); *cf.* 11 C.F.R. § 102.5.b.1 (2004); *id.* § 300.2.g, k (2006) (defining "federal" and "nonfederal" money).

### G. Overbreadth: The Section 1.28 and Section 1.91 Requirements

Sections 1.28 and 1.91 unconstitutionally impose political-committee burdens.[54] There is no need to reach Part II.G. *See NMYO,* ____ F.3d at ____, manuscript op. at 13-19 (considering only political-committee status and not going further, as the district court had). *In the alternative,*[55] Sections 1.28 and 1.91 fail exacting scrutiny.

---

[54] *Supra* Part II.F.

[55] VC ¶ 33.

54

### 1. Exacting Scrutiny

Exacting scrutiny applies to disclosure requirements, including attribution, disclaimer,[56] and reporting requirements, both for entities government *may* regulate as political committees under *Buckley,* 424 U.S. at 74-79, *see Davis v. FEC,* 554 U.S. ____, ____, 128 S.Ct. 2759, 2775 (2008) (quoting *Buckley,* 424 U.S. at 64), and for those it may *not.* *See Citizens United,* 130 S.Ct. at 914 (quoting *Buckley,* 424 U.S. at 64, 66). It is a "strict standard of scrutiny," *Buckley,* 424 U.S. at 75 (citing *NAACP v. Alabama,* 357 U.S. 449, 458, 460 (1958)), and a "strict test[.]" *Id.* at 66.

Of course, full-fledged political-committee *disclosure requirements* apply only if the jurisdiction's regulation of organizations as political committees – *i.e.,* only if the *definition* through which the jurisdiction imposes political-committee burdens[57] – is constitutional in the first place. So *before* considering whether such disclosure requirements are vague and survive exacting scrutiny, one must consider whether the definition is vague and survives strict scrutiny; strict scrutiny includes the "under the control of a candidate" and major-purpose tests. When the definition is

---

[56] Some jurisdictions call attribution requirements "disclaimer" requirements, *e.g.,* 11 C.F.R. § 110.11 (2006), yet that is a misnomer. *Majors v. Abell,* 361 F.3d 349, 350 (7th Cir. 2004) ("*Majors II*"). Attribution requirements do not "disclaim" speech. They "claim" it. *See, e.g.,* 2 U.S.C. § 441d.a.1-2 (2002). The word "disclaimer" should apply only to what really does disclaim. *See, e.g., id.* § 441d.a.3.

[57] VC ¶¶ 27, 29.

55

unconstitutional – as Wisconsin's is[58] – the jurisdiction has no means to impose

such requirements, so the requirements are unnecessary to consider.[59]

---

[58] *Supra* Part II.F.

[59] Moreover, government may impose greater disclosure burdens on entities it *may* regulate as political committees under *Buckley,* 424 U.S. at 74-79, than it may impose on other entities. *Supra* Part II.F.2.

*Therefore, it would be incorrect to lump full-fledged political-committee disclosure requirements and other disclosure requirements into one constitutional-scrutiny analysis.* It is possible, for example, for it to be *un*constitutional to (1) regulate an entity as a full-fledged political committee even when it *is* constitutional to (2) regulate the entity's speech by less-restrictive means. *See, e.g., Citizens United,* 130 S.Ct. at 897-98, 914-16 (noting the burdens of being a full-fledged political committee, and later upholding disclosure requirements for electioneering communications as defined in FECA by an entity that is *not* a political committee); *MCFL,* 479 U.S. at 254-55, 262 (noting the burdens of being a full-fledged political committee, and later upholding reporting requirements for express advocacy as defined in *Buckley* by an entity that is *not* a political committee); *Buckley,* 424 U.S. at 74-81 (establishing the tests for when government may regulate entities as full-fledged political committees and later upholding reporting requirements for express advocacy as defined in *Buckley* by persons government may *not* regulate as political committees).

Not distinguishing (1) from (2) is among a *pre-Citizens United* Ninth Circuit panel's mistakes in *Alaska Right to Life Committee v. Miles,* 441 F.3d 773, 786-94 (9th Cir.) ("*ARLC*"), *cert. denied,* 549 U.S. 886 (2006). By not following the major-purpose test, *see id., ARLC* contradicts Ninth Circuit precedent that does follow the test, *see CPLC I,* 328 F.3d at 1101 n.16 (quoting *MCFL,* 479 U.S. at 252-53), albeit without "precision[.]" *Supra* Part II.F.4.

*ARLC* even holds full-fledged political-committee disclosure is not "onerous[,]" because Alaska law has no limits on contributions received, has no political-committee spending limits, does not have reporting requirements limiting political committees' fundraising ability, and does not require "structural changes" in entities. 441 F.3d at 791. However, this contradicts *MCFL,* 479 U.S. at 254-55. *Supra* Part II.F.2. And Supreme Court decisions since *ARLC* hold political-committee status is not only "burdensome[,]" *Citizens United,* 130 S.Ct. at 897, but also "onerous[,]" *id.* at 898; *WRTL II,* 551 U.S. at 477 n.9 (citing *MCFL,* 479 U.S. at 253-55), even when it requires "only" – so to speak – (1) registration, including

56

treasurer designation, (2) recordkeeping, or (3) extensive reporting. *See Citizens United,* 130 S.Ct. at 897-98.

Furthering the *ARLC* confusion *pre-Citizens United*, another Ninth Circuit panel – while rejecting full-fledged political-committee burdens, *California Pro-Life Council v. Randolph,* 507 F.3d 1172, 1187-89 (9th Cir. 2007) ("*CPLC II*") – says government may impose disclosure requirements "irrespective of the major purpose of an organization[.]" *Id.* at 1180 n.11 (citing *ARLC,* 441 F.3d at 786). This is incomplete and misleading. Government may impose "onerous" political-committee disclosure requirements under particular circumstances; government may impose other disclosure requirements under other particular circumstances. The two analyses differ.

Even if *ARLC* and *CPLC II* were good law before *Citizens United,* they do not survive *Citizens United,* especially in combination with *WRTL II* and *MCFL*.

The District of Columbia Circuit's *SpeechNow* opinion similarly contradicts *MCFL, WRTL II,* and *Citizens United.*

Although *SpeechNow* does not lump full-fledged political-committee disclosure requirements and other disclosure requirements into one constitutional-scrutiny analysis, *SpeechNow* can still be confusing, because it addresses both kinds of disclosure simultaneously. *See id.* at 696-97. It can also be confusing, because it addresses the political-committee definition *after, not before,* addressing political-committee disclosure requirements. *See id.* at 697-98. These may mislead the reader into either lumping the two types of disclosure into one constitutional-scrutiny analysis or considering a political-committee definition and political-committee disclosure requirements in the wrong order.

Apart from that, *SpeechNow* in effect upholds the political-committee definition as applied to SpeechNow's speech by saying that regulating an entity as a political committee is not that much more burdensome than just requiring reporting of independent expenditures properly understood. *Id.* This reasoning is incorrect as matter of federal statutory law. *Compare* 2 U.S.C. §§ 432, 433, 434 *with id.* § 434.c, g; *see also SpeechNow*, 599 F.3d at 691-92 (listing political-committee burdens). It is also incorrect as a matter of constitutional law. In this respect, *SpeechNow* – like *ARLC* and *CPLC II* – contradicts *MCFL,* 479 U.S. at 254-55. *Supra* Part II.F.2. It also contradicts Supreme Court decisions holding political-committee status is not only "burdensome[,]" *Citizens United,* 130 S.Ct. at 897, but also "onerous[,]" *id.* at 898; *WRTL II,* 551 U.S. at 477 n.9 (citing *MCFL,* 479 U.S. at 253-55), even when it requires "only" (1) registration, including treasurer designation, (2) recordkeeping, or (3) extensive reporting. *See Citizens United,* 130 S.Ct. at 897-98.

57

Under exacting scrutiny, a court first asks whether there is a "sufficiently important" government interest in regulating the speech. Only if there is does a court ask whether there is a "substantial relation" between the law and the interest. *Citizens United,* 130 S.Ct. at 914 (quoting *Buckley,* 424 U.S. at 64, 66). "This type of scrutiny is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of … requiring disclosure." *Buckley,* 424 U.S. at 65 (citing *NAACP v. Alabama,* 357 U.S. 449, 461 (1958)). Under exacting scrutiny, "the strength of the government[] interest must reflect the seriousness of the … burden on First Amendment rights." *Davis,* 128 S.Ct. at 2775 (citing *Buckley,* 424 U.S. at 68).[60]

---

[60] In recent years, the Supreme Court has separated strict, exacting, and intermediate scrutiny. As the Court has politely put it, such "[p]recision … was not a pretense of" *Buckley. Nixon v. Shrink Mo. Gov't PAC,* 528 U.S. 377, 386 (2000). "Exacting scrutiny" does not mean strict scrutiny, *compare Citizens United,* 130 S.Ct. at 898 (strict scrutiny (quoting *WRTL II,* 551 U.S. at 464)) *with id.* at 914 (exacting scrutiny (quoting *Buckley,* 424 U.S. at 64, 66)), nor does it mean intermediate scrutiny. Intermediate scrutiny asks whether law is "closely drawn" to meet a "sufficiently important" government interest, *FEC v. Colorado Republican Fed. Campaign Comm.,* 533 U.S. 431, 446 (2001) ("*Colorado Republican II*") (quoting *Shrink Missouri,* 528 U.S. at 388), and is for other law. *See Randall v. Sorrell,* 548 U.S. 230, 247 (2006) (considering contributions received by candidates (quoting *Buckley,* 424 U.S. at 25 (same))); *McConnell,* 540 U.S. at 136-37 (considering contributions received by political parties); *FEC v. Colorado Republican Federal Campaign Committee,* 533 U.S. 431, 446 (2001) ("*Colorado Republican II*") (considering spending for political speech coordinated by political parties with candidates (quoting *Shrink Missouri,* 528 U.S. at 387-88 (considering contributions received by candidates))); *Beaumont v. FEC,* 539 U.S. 146, 162 (2003) (considering contributions by *MCFL* corporations to candidates (quoting *Shrink Missouri,* 528 U.S. at 387-88)); *cf. Citizens Against Rent Control v. City of Berkeley,*

58

*Citizens United* forecloses some rationales for regulating political speech:

> "Favoritism and influence are not ... avoidable in representative politics. It is in the nature of an elected representative to favor certain policies, and, by necessary corollary, to favor the voters and contributors who support those policies. It is well understood that a substantial and legitimate reason, if not the only reason, to cast a vote for, or to make a contribution to, one candidate over another is that the candidate will respond by producing those political outcomes the supporter favors. Democracy is premised on responsiveness." *McConnell,* 540 U.S., at 297 (opinion of Kennedy, J.).

> Reliance on a "generic favoritism or influence theory ... is at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle." *Id.,* at 296.

> The appearance of influence or access, furthermore, will not cause the electorate to lose faith in our democracy.

*Citizens United,* 130 S.Ct. at 910. "Ingratiation" also does not justify regulating speech. *See id.*

Thus, Wisconsin may apply disclosure requirements only when it has the power to do so. *See Vermont Right to Life Comm., Inc. v. Sorrell,* 221 F.3d 376, 386, 389 (2d Cir. 2000). In applying scrutiny to disclosure requirements, the first inquiry is whether they survive scrutiny, not what impact they have on particular speakers or their speech. *See AFL-CIO v. FEC,* 333 F.3d 168, 176 (D.C. Cir. 2003) (citing *Buckley,* 424 U.S. at 69-74).

---

454 U.S. 290, 298 (1981) (considering donations received for *ballot measures* and applying "exacting scrutiny").

## 2. Spending for Political Speech

When it comes to persons Wisconsin may *not* regulate as political committees under *Buckley,* 424 U.S. at 74-79, the *only* spending for political speech[61] that Supreme Court precedent has established Wisconsin has a sufficiently important interest in regulating is:

- Express advocacy, *id.* at 39-51, 74-81, as defined in *Buckley, id.* at 44 & n.52, 80, *vis-à-vis state or local office in Wisconsin,* and

- Regulable speech "about a candidate shortly before an election." *Citizens United,* 130 S.Ct. at 915: Electioneering communications as defined in FECA, *id.* at 914-16,[62] having a clearly identified candidate *for state or local office in Wisconsin.*

*See, e.g., NCRL III,* 525 F.3d at 281-82. This is because of pre-emption of state law in federal matters and states' sovereignty over their own, though not other states', elections.[63] While some of WRTL's speech is such express advocacy, the *Life Voice* story and the issue-advocacy flier are not. Nor are they such electioneering communications, because they are not *Broadcast* speech.

---

[61] One should avoid the term "expenditure" here, because when it comes to such persons, "expenditure" is a term of art referring only to express advocacy as defined in *Buckley. See* 424 U.S. at 44 & n.52, 80. Similarly, "contribution" is a term of art for donations that are regulable. *See id.* at 23 n.24, 78.

[62] In short, electioneering communications as defined in FECA are communications that (1) are broadcast, cablecast, or satellite speech ("Broadcast"), 2 U.S.C. § 434.f.3.A.i (2002), (2) run in the 30-60 Day Windows, *id.* § 434.f.3.A.i.II, (3) have a clearly identified candidate in the jurisdiction in question, *see id.* § 434.f.3.A.i.I, (4) are targeted to the relevant electorate, *id.* § 434.f.3.A.i.III, and (5) do not expressly advocate. *See id.* § 434.f.3.B.ii; *see also id.* § 434.f.3.B (additional exceptions not material here).

[63] *Supra* Parts II.C.2.b, II.F.5.

*Never has the Supreme Court upheld* regulation *of any other spending for a political speech by a person that government may not regulate as a political committee. That is, never has the Supreme Court held that government has a constitutional interest in regulating other speech by a person that government may not regulate as a political committee. See Citizens United,* 130 S.Ct. at 914-16 (electioneering communications as defined in FECA); *MCFL,* 479 U.S. at 262 (express advocacy (citing 2 U.S.C. § 434.c)); *Buckley,* 424 U.S. at 80-81 (express advocacy).[64]

To understand these two subcategories, it is helpful to begin with the premise that persons are free to engage in political speech without limit or other regulation, except when government constitutionally limits or otherwise regulates it,[65] and then review the case law on spending for political speech by persons a jurisdiction may not regulate as political committees under *Buckley,* 424 U.S. at 74-79. *See New Mexico Youth Organized v. Herrera,* No. CIV 08-1156 JCH/WDS, order at 12-18

---

[64] *WRTL II* notes that the Supreme "Court has never recognized a compelling interest in regulating ads, like WRTL's, that are neither express advocacy nor its functional equivalent." 551 U.S. at 476, *followed in NMYO,* ____ F.3d at ____, manuscript op. at 13, *and NCRL III,* 525 F.3d at 281-82. However, the "functional equivalent of express advocacy" is what passes the appeal-to-vote test, *id.* at 457, 469-70, 474 n.7, which *Citizens United* does away with, *infra* Part II.G.2, and renders unconstitutionally vague. *Supra* Part II.D.3. Thus, what *Citizens United* does to the appeal-to-vote test it also does to the "functional equivalent of express advocacy."

[65] *Supra* Part II.C.1-2.

Case 2:10-cv-00669-CNC   Filed 08/05/10   Page 61 of 89   Document 4

(D.N.M. Aug. 3, 2009) ("*NMYO*"),[66] *aff'd on other grounds,* \_\_\_\_ F.3d \_\_\_\_, \_\_\_\_, manuscript op. at 13-19 (10th Cir. June 30, 2010).[67]

*Buckley* divided such spending into express advocacy and issue advocacy and held that government may regulate only express advocacy, 424 U.S. at 39-51, 74-81, as defined in *Buckley,* 424 U.S. at 44 & n.52, 80. *See also WRTL II,* 551 U.S. at 457 (citing *MCFL,* 479 U.S. at 249); *Brownsburg,* 137 F.3d at 505; *cf.* 2 U.S.C. § 431.17 (2002) (following *Buckley* by limiting the statutory independent-expenditure definition to express advocacy).

Under *Buckley,* express advocacy was the only form of such spending that was unambiguously campaign related. *See* 424 U.S. at 80-81. That is, it was the only form of spending for political speech that government had a constitutional interest in regulating. *See NCRL III,* 525 F.3d at 281 (citing *Buckley,* 424 U.S. at 80). The express-advocacy test, under which speech is express advocacy only if it expressly advocates the election or defeat of a clearly identified candidate using terms "such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' [or] 'reject[,]'" *Buckley,* 424 U.S. at 44 & n.52, 80, *quoted in McConnell,* 540 U.S. at 191, *and MCFL,* 479 U.S. at 249, "is directed precisely to that spending that is unambiguously related to the campaign of a particular …

---

[66]    *Available    at*    http://www.nmcourt.fed.us/Drs-Web/view-file?full-path-file-name=%2Fdata%2Fdrs%2Fdm%2Fdocuments%2Fndd%2F2009%2F08%2F03%2F0002481726-0000000000-08cv01156.pdf.

[67] *Available at* http://www.ck10.uscourts.gov/opinions/09/09-2212.pdf.

candidate." *Id.* at 80; *see also McConnell,* 540 U.S. at 281 (Thomas, J., dissenting) (quoting *Buckley,* 424 U.S. at 81). Applying the test to disclosure requirements, for example, assures they "shed the light of publicity on spending that is unambiguously campaign related but would not otherwise be reported because it takes the form of independent expenditures or of contributions to [a person] not itself required to report the names of its contributors." *Buckley,* 424 U.S. at 81. And they are not "otherwise … reported[,]" because government may not regulate the person as a political committee under *Buckley,* 424 U.S. at 74-79.

Then *McConnell* in effect established that electioneering communications as defined in FECA, while not express advocacy,[68] are also "unambiguously related to the campaign of a particular … candidate." *NCRL III,* 525 F.3d at 281 (ellipsis in original) (quoting *Buckley,* 424 U.S. at 80). That is, they are also a form of spending for political speech that government has a constitutional interest in regulating. *See id.* (citing *Buckley,* 424 U.S. at 80). *Citizens United* affirms that government may, subject to further inquiry, have the power to regulate electioneering

---

[68] By definition, express advocacy and electioneering communications as defined in FECA are mutually exclusive. They do not overlap. Indeed, they *cannot* overlap. *Buckley* limits the FECA expenditure and independent-expenditure definitions to express advocacy – with express advocacy being a subset of "expenditure" and "independent expenditure." 424 U.S. at 44 & n.52, 80. And under FECA, neither expenditures nor independent expenditures are electioneering communications. 2 U.S.C. § 434.f.3.B.ii; *see NCRL III,* 525 F.3d at 282 (stating that electioneering communications are "beyond" express advocacy); *see also McConnell,* 540 U.S. at 189 (stating that the electioneering-communication definition is not limited to express advocacy).

communications as defined in FECA. 130 S.Ct. at 896-916.[69] They may be regulable speech "about a candidate shortly before an election." *Id.* at 915.

Whether electioneering communications as defined in FECA pass the appeal-to-vote test no longer affects whether government may regulate them. *Compare WRTL II,* 551 U.S. at 457, 469-70, 474 n.7, *with Citizens United,* 130 S.Ct. at 889-90, 915. *WRTL II* holds that government may ban them – and implies that government may otherwise regulate them[70] – only when they pass the test. 551 U.S. at 457, 469-70, 474 n.7.[71] But *Citizens United* holds that regardless of whether they pass the test, government may *not* ban electioneering communications as defined FECA, *e.g.,* 130 S.Ct. at 889-90, by persons other than foreign nationals, *see id.* at 911 (citing 2 U.S.C. § 441e),[72] and *may,* subject to further inquiry, *see, e.g., id.* at 915-16 (giving an example of when disclosure is unconstitutional), have the power to regulate them by requiring disclosure – including reporting, attribution,

---

[69] Thus, it is incorrect to suggest, as one district court has, that the unambiguously-campaign-related principle is nothing more than the express-advocacy test. *See RNC v. FEC,* _____ F. Supp.2d _____, _____, manuscript order at 9 (D.D.C. March 26, 2010), *available at* https://ecf.dcd.uscourts.gov/cgi-bin/show_public_doc?2008cv1953-102, *aff'd mem.,* 561 U.S. _____, 130 S.Ct. _____ (2010), *available at* http://www.supremecourt.gov/orders/courtorders/062910zr.pdf.

[70] *See* 551 U.S. at 457, 465, 471, 476-77, 477, 478, 478-79, 479, 480, 481.

[71] They pass the test when their only reasonable interpretation is an as appeal to vote for or against a clearly identified candidate in the jurisdiction. *See WRTL II,* 551 U.S. at 457, 469-70, 474 n.7.

[72] Nor may government limit *any* independent spending for political speech by such persons, *see, e.g., Buckley,* 424 U.S. at 44-51, much less ban it. *See Citizens United,* 130 S.Ct. at 896-914.

64

and disclaimer requirements. *Id.* at 915. Since the appeal-to-vote test applies *only* to electioneering communications as defined in FECA, *WRTL II,* 551 U.S. at 474 n.7,[73] it no longer serves any constitutional purpose. *Citizens United* does away with the appeal-to-vote test.

As for the express-advocacy test, since *McConnell,* 540 U.S. at 190-94, some have asserted the express-advocacy test no longer exists. This was incorrect before *WRTL II, see Anderson v. Spear,* 356 F.3d 651, 663-66 (6th Cir.) (applying *Buckley* post-*McConnell* to a state law), *cert. denied,* 543 U.S. 956 (2004); *Center for Individual Freedom v. Carmouche*, 449 F.3d 655, 665 n.7 (5th Cir. 2006) ("*CFIF I*") (same) (citing *Anderson,* 356 F.3d at 664-65), *cert. denied,* 549 U.S. 1112 (2007); *ACLU of Nevada v. Heller,* 378 F.3d 979, 985 (9th Cir. 2004) (citing *Anderson,* 356 F.3d at 664-65), and it remains incorrect. *See WRTL II,* 551 U.S. at 499 (Scalia, J., concurring in part and concurring in the judgment).

*McConnell* holds that the express-advocacy test – rather than being the sole boundary around government's power *vis-à-vis* persons the jurisdiction may not regulate as political committees under *Buckley,* 424 U.S. at 74-79 – is a bulwark against unconstitutional vagueness and overbreadth. 540 U.S. at 190-94. *McConnell* also states that neither *Buckley* nor *MCFL* "suggested that [law] that

---

[73] *See also NCRL III,* 525 F.3d at 282 ("to be … the 'functional equivalent of express advocacy,' a communication must qualify as an 'electioneering communication,' [as] defined by … 2 U.S.C. § 434(f)(3)(A)(i)" (citing *WRTL II,* 127 S.Ct. 2652, 2667 (2007))).

was *neither vague nor overbroad* would be required to toe the same express advocacy line." *Id.* at 192 (emphasis added).

However, when law reaches beyond speech that government has the power to regulate, it *is* overbroad. *See Buckley,* 424 U.S. at 80 ("impermissibly broad"). Sometimes overbreadth stems from vagueness. *See id.* at 44-51, 79-81.[74]

Instead of doing away with the express-advocacy test, *McConnell* and *Citizens United* taken together expand what government may, subject to further inquiry, have the power to regulate to include both express advocacy as defined in *Buckley, see WRTL II,* 551 U.S. at 457 (citing *MCFL,* 479 U.S. at 249), and electioneering communications as defined in FECA. *Citizens United,* 130 S.Ct. at 896-916. Although neither *McConnell* nor *Citizens United* uses the phrase "unambiguously campaign related," *but see McConnell,* 540 U.S. at 281, 283 (Thomas, J., dissenting) (each quoting *Buckley,* 424 U.S. at 81), their net effect is to expand what government has a constitutional interest in regulating in this way. As previously noted,[75] *the Supreme Court has never allowed* regulation *of any other form of spending for political speech by persons that the jurisdiction in question may not regulate as political committees under Buckley,* 424 U.S. at 74-79.

---

[74] *McConnell* does not hold that law regulating political speech is constitutional as long as the law is not vague. *See* 540 U.S. at 192; *Anderson,* 356 F.3d at 663-66; *CFIF I*, 449 F.3d at 665 & n.7 (citing *Anderson,* 356 F.3d at 664-65); *Heller,* 378 F.3d at 985 (citing *Anderson,* 356 F.3d at 664-65). That cannot be. *See supra* Parts II.C.1-2. It ignores the words "nor overbroad" in *McConnell,* 540 U.S. at 192, and is contrary to law.

[75] *Supra* Part II.G.2.

66

Contrary to what may be a premise behind law challenged in this action, *McConnell* simply does not break the dam holding back a flood of regulation of political speech. Instead, *McConnell* upholds a particular law against a facial challenge without breaking the dam, *see, e.g., WRTL II,* 551 U.S. at 457; *McConnell,* 540 U.S. at 190-94, and *Citizens United* overrules part of *McConnell.* 130 S.Ct. at 896-914.

### 3. Government's Interest in Disclosure

While *McConnell* speaks of government's interest in "[(1)] providing the electorate with information, [(2)] deterring actual corruption and avoiding its appearance, and [(3)] gathering data necessary to enforce more substantive electioneering restrictions[,]" 540 U.S. at 196 (citing *Buckley*), *McConnell* does not explain these three interests. *See id.* Yet *Buckley* does:

> First, disclosure provides the electorate with information "as to where political campaign money comes from and how it is spent *by the candidate*" … to aid the voters in evaluating *those who seek … office* [in the jurisdiction]. It allows voters to place each *candidate* in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of *a candidate's* financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office.
>
> Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large *contributions* and *expenditures* to the light of publicity. This exposure may discourage those who would use money for improper purposes either before or after the election. A public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors that may be given in return. And, as we recognized in *Burroughs v. United States,* 290 U.S. [534,] 548 [(1934)], Congress could reasonably conclude that full disclosure during an

67

election campaign tends "to prevent the corrupt use of money to *affect elections*." …

Third, and not least significant, recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the *contribution limit*[]s … .

*Buckley,* 424 U.S. at 66-68 (emphasis added and footnotes omitted).

*Buckley* Interests 1 and 3 concern "information" and "data." However, the "constitutional power of Congress to regulate federal elections[,]" *id.* at 13 & n.16, and each state's parallel power over its own, though not other states', elections, *see, e.g., NCRL III,* 525 F.3d at 281, cannot include power to gather "information" or "data" for information's or data's sake. *See, e.g.,* U.S. CONST. amend. IV (1791); *Mapp v. Ohio*, 367 U.S. 643, 655 (1961) (applying the Fourth Amendment to the states). An interest in gathering information or data is "clever, but has no stopping point." *United States v. Lopez,* 514 U.S. 549, 600 (1995) (Thomas, J., concurring) (Interstate Commerce Clause challenge). It "is unbounded and susceptible to no limiting principle." *Citizens United,* 130 S.Ct. at 910 (citing *McConnell,* 540 U.S. at 296 (opinion of Kennedy, J.)). *Buckley,* by referring to "information" about where campaign money comes from and how candidates spend it, 424 U.S. at 66-67, applies Interest 1 to information about *candidate committees'* money. *See id.; McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 354 (1995) ("Those comments concerned contributions to the candidate or expenditures authorized by the candidate or his responsible agent. They had no reference to the kind of independent activity pursued by Mrs. McIntyre."). *Buckley* also applies Interest 1

68

to independent expenditures as defined in *Buckley*. *See* 424 U.S. at 80-81. *Citizens United* then applies Interest 1 to electioneering communications as defined in FECA. 130 S.Ct. at 914-15. Indeed, by applying the "informational interest" to those "speaking about a candidate *shortly before* an election[,]" 130 S.Ct. at 915 (emphasis added), *Citizens United* confirms that government may, subject to further inquiry, *see, e.g., id.* at 915-16 (giving an example of when disclosure is unconstitutional), have the power to regulate electioneering communications as defined in FECA. However, no candidate-committee money is at issue in this action.[76] While WRTL's radio ad, telephone calls, flier, and website page are express advocacy as defined in *Buckley,* the *Life Voice* story and the issue-advocacy flier are neither express advocacy as defined in *Buckley* nor electioneering communications as defined in FECA.

*Buckley* applies Interest 3 to data regarding *limits* on contributions received. *Id.* at 68; *see Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth,* 556 F.3d 1021, 1032 (9th Cir. 2009) (rejecting Interest 3 where no contribution or spending limit was constitutional in the first place (citing *McConnell,* 540 U.S. at 196)); *California Pro-Life Council v. Getman*, 328 F.3d 1088, 1105 n.23 (9th Cir. 2003) ("*CPLC I*") (rejecting Interest 3 where no contribution or spending limit was

---

[76] Even if Interest 1 – like Interest 2, *see infra* Part II.G.3 – also covered political committees other than candidate committees, Wisconsin may not regulate WRTL as a political committee under *Buckley,* 424 U.S. at 74-79. *Supra* Part II.F.

69

at issue).[77]  However, Wisconsin law does not *limit* donations WRTL receives in a capacity other than as a committee/political committee or a "person[] other than [a] political committee[]."[78]

As for Interest 2 – the interest in deterring corruption and its appearance by revealing large contributions and expenditures, 424 U.S. at 67 – this by its terms is part of the interest in preventing corruption of candidates or officeholders, or its appearance.  However, *Buckley* applies Interest 2 only to "contributions" and "expenditures" it holds are regulable in the first place.  In this action, it is unnecessary to consider "contributions" received and "expenditures" made by persons Wisconsin *may* regulate as committees/political committees under *Buckley,* 424 U.S. at 74-79, because WRTL is no such person.[79]  When it comes to persons Wisconsin may *not* regulate as political committees under *Buckley,* 424 U.S. at 74-79, the interest in preventing corruption or its appearance – and therefore Interest 2 – does not even apply to *independent* spending for political speech.  *See Citizens United,* 130 S.Ct. at 909-10.[80]  All of the spending for political speech at issue here

---

[77] *McConnell* does not apply Interest 3 to electioneering communications as defined in FECA.  *See* 540 U.S. at 196.  It could not have.  FECA does not *limit* contributions for electioneering communications, *see, e.g.,* 2 U.S.C. § 434.f, so no such limit was before the Court.

[78] *Cf.* VC ¶ 27 (noting contribution-source bans *via* Wisconsin and federal law).

[79] *Supra* Part II.F.

[80] Meaning speech not coordinated with a candidate, the candidate's agents, the candidate's committee, *Buckley,* 424 U.S. at 78, *quoted in Survival Educ. Fund,* 65 F.3d at 294, or a party.  *McConnell,* 540 U.S. at 219-23.

70

is independent.  Therefore, Interest 2, like Interests 1 and 3, does not even apply. *Cf. CPLC I,* 328 F.3d at 1105 n.23 (rejecting Interest 2, because "the risk of corruption … in cases involving candidate elections simply is not present in a popular vote on" a ballot measure (quoting *Bellotti,* 435 U.S. at 789-90)).  The *Buckley* discussion of Interest 2 does refer to what "affect[s] elections[,]" 424 U.S. at 67, yet that is not the standard for what is regulable.  Again, discussing public issues that are also electoral-campaign issues "naturally and inexorably" influences elections, *FEC v. Central Long Island Tax Reform Immediately Comm.,* 616 F.2d 45, 53 (2d Cir. 1980) (*en banc*) (quoting *Buckley,* 424 U.S. at 42 n.50), and "influencing elections" is a "classic form of issue advocacy[.]"  *NCRL I,* 168 F.3d at 713.

Therefore, neither Interest 2 nor 3 applies in this action.  *See Canyon Ferry,* 556 F.3d at 1032 (rejecting Interest 3 where no contribution or spending limit was constitutional in the first place (citing *McConnell,* 540 U.S. at 196)).  Interest 1 applies only to WRTL's radio ad, telephone calls, flier, and WRTL website page, but not to its *Life Voice* story or issue-advocacy flier.

### 4.    Applying Exacting Scrutiny

"Even a casual reading of" Wisconsin law, *VRLC I,* 221 F.3d at 386, reveals Sections 1.28 and 1.91 reach beyond spending for political speech that courts allow government to regulate.   That is, Wisconsin reaches beyond what it has a

---

This holding of *Citizens United* in effect overrules any suggestion that *McConnell,* 540 U.S. at 196, applies Interest 2 to electioneering communications as defined in FECA when they are not coordinated.

sufficiently important interest in regulating. Contrary even to *McConnell,* Wisconsin law on its face reaches even "genuine issue" speech. 540 U.S. at 206 n.88. With the Supreme Court having done away with the appeal-to-vote test,[81] and rendered it unconstitutionally vague,[82] it is not clear what the non-vague boundary between regulable speech and "genuine issue" speech is. *Cf. WRTL II,* 551 U.S. at 492-94 (Scalia, J., concurring in part and concurring in the judgment). Yet if WRTL's *Life Voice* story and issue-advocacy flier are not genuine issue speech, then what is? *See id.* at 470-72 (majority opinion).

In any event, Wisconsin law reaches beyond *spending-for-political-speech* boundaries. That is, it reaches beyond express advocacy as defined in *Buckley,* 424 U.S. at 44 n.52, 80, and beyond what the Supreme Court has held may be regulable speech "about a candidate shortly before an election." *Citizens United,* 130 S.Ct. at 915. This occurs through Sections 1.28.1.a, 1.28.1.b, 1.28.2.a, 1.28.2.c, 1.28.3, and 1.91.

While Wisconsin is right in limiting its candidate definition to state or local office in Wisconsin, *see* WIS. STAT. § 11.01.1, Wisconsin limits neither Section 1.28.1.a, 1.28.1.b, 1.28.2.a, 1.28.2.c, 1.28.3, nor 1.91 to express advocacy as defined in *Buckley vis-à-vis* state or local office in Wisconsin. Once Wisconsin reaches beyond this boundary, the *only* spending for political speech it may, subject to

---

[81] *Supra* Part II.G.2.

[82] *Supra* Part II.D.3.

further inquiry, *see, e.g., Citizens United,* 130 S.Ct. at 915-16 (giving an example of when disclosure is unconstitutional), regulate is electioneering communications as defined in FECA having a clearly identified candidate for state or local office in Wisconsin. Wisconsin reaches beyond this boundary too. First, Wisconsin reaches beyond Broadcast speech *via* Sections 1.28.1.a, 1.28.1.b, 1.28.2.a, 1.28.2.c, 1.28.3, and 1.91. Second, Sections 1.28.1.a, 1.28.1.b, 1.28.2.a, 1.28.2.c, 1.28.3.a, and 1.91 reach speech outside the 30-60 Day Windows.[83] Third, Wisconsin law has no requirement that speech be targeted to the relevant electorate.[84] How can speech not targeted to the relevant *electorate* possibly be regulable, *i.e.,* unambiguously *campaign* related? That is, how can it be speech that government has a constitutional interest in regulating? *Cf. NCRL III,* 525 F.3d at 281 (citing *Buckley,* 424 U.S. at 81).

Because Wisconsin reaches beyond what Wisconsin has a sufficiently important interest in regulating, its law fails exacting scrutiny and is unconstitutional as applied to WRTL's speech, and it is unnecessary to consider

---

[83] Section 1.28.3.a's reaching outside the 30-60 Day Windows is constitutional for express advocacy as defined in *Buckley,* yet the phrase "functional equivalents" brings Section 1.28.3.a beyond express advocacy as defined in *Buckley. Supra* Part II.G.2.

[84] Plaintiffs do not assert that a state would have to define "targeted to the relevant electorate" with FECA's numbers, especially since some districts have fewer than 50,000 people. *Cf.* 2 U.S.C. § 434.f.3.C (defining "targeted to the relevant electorate" under FECA). Whether the Constitution would require a particular number or a number in a particular range is a question for another day. Here it suffices to note the law has *no* targeting requirement.

73

whether any factors such as those *Citizens United* mentions, 130 S.Ct. at 915-16, mean there is no "substantial relation" between the disclosure requirements and a "'sufficiently important' government[] interest." *Id.* at 914 (quoting *Buckley,* 424 U.S. at 64, 66).

For these reasons, Sections 1.28.1.a, 1.28.1.b, 1.28.2.a, 1.28.2.c, 1.28.3, and 1.91 are unconstitutional as applied to WRTL's speech.

The fact that some WRTL speech *is* express advocacy does not justify regulating it *via* Section 1.28 or 1.91, because the Section 1.28 and 1.91 requirements extend beyond the limited independent-expenditure disclosure requirements that case law allows, *see Buckley,* 424 U.S. at 80-81, for entities that government may *not* regulate as political committees under *Buckley,* 424 U.S. at 74-79.[85]

### H.     Overbreadth:  24 Hour Reporting

The 24 hour reporting requirements[86] are so great that the government's interest does not reflect the burden on the speech. *See Davis,* 128 S.Ct. at 2775 (citing *Buckley,* 424 U.S. at 68).  This regulation of WRTL-SPAC's speech takes up precious resources.   The 24 hour reporting requirement is unconstitutional as applied to WRTL-SPAC's speech.   It is "patently unreasonable" and "severely burdens First Amendment rights[.]"  *Citizens for Responsible Gov't State PAC v.*

---

[85] *See* VC ¶¶ 27, 29.

[86] VC Part I.C.2.

*Davidson,* 236 F.3d 1174, 1197 (10th Cir. 2000).[87] The burden is especially great on small committees such as WRTL-SPAC. *Cf. WRTL II,* 551 U.S. at 477 n.9 (referring to political-committee burdens on small nonprofit corporations (citing *MCFL,* 479 U.S. at 253-55)).

## I.     Overbreadth:  Oath for Independent Disbursements

Prior restraints receive strict scrutiny. *E.g., David K. v. Lane,* 839 F.2d 1265, 1276 (7th Cir. 1988) ("compelling governmental interest" (citing *Brown v. Glines,* 444 U.S. 348, 364 (1980) [(Brennan, J., dissenting)])); *Arizona Right to Life PAC v. Bayless,* 320 F.3d 1002, 1009 (9th Cir. 2003) ("*ARLPAC*"). The oath-for-independent-disbursements requirement[88] is a prior restraint, fails strict scrutiny, and is unconstitutional as applied to WRTL-SPAC's speech.

A law that forbids speech before it occurs is a prior restraint, *Wil-Kar, Inc. v. Village of Germantown,* 153 F. Supp.2d 982, 994 (E.D. Wis. 2001) (citing *Alexander v. United States,* 509 U.S. 544, 550 (1993)), regardless of whether "a public official has the additional authority to grant or deny the permission to exercise First Amendment rights." *United Elec., Radio & Machine Workers of Am. v. State*

---

[87] *North Carolina Right to Life Committee Fund for Independent Political Expenditures v. Leake* rejects a challenge to a 24 hour reporting requirement by saying *McConnell* upheld one.  524 F.3d 427, 439 (4th Cir.) ("*NCRL-FIPE*") (citing *McConnell,* 540 U.S. at 195-95), *cert. denied,* ____ U.S. ____, 129 S.Ct. 490 (2008). However, the *McConnell* plaintiffs did not challenge 24 hour reporting.  While they challenged a law with 24 hour reporting, they challenged it for other reasons. *See* 540 U.S. at 195.  Thus, *McConnell* does not apply, and *NCRL-FIPE* is incorrect.

[88] VC Part I.C.3.

75

*Employment Relations Bd.,* 710 N.E.2d 358, 365 (Ohio Ct. App. 8 Dist.) (collecting authorities, including *Thomas v. Collins,* 323 U.S. 516, 540 (1945)), *appeal not allowed,* 700 N.E.2d 331 (Ohio 1998); *see ARLPAC,* 320 F.3d at 1008-09; *cf. Wisconsin Realtors Ass'n v. Ponto,* 233 F. Supp.2d 1078, 1090-93 (W.D. Wis. 2002) (holding that a prior restraint is unconstitutional for reasons other than its being a prior restraint). Thus, the oath requirement, which restricts forms of speech, *see, e.g., Austin,* 494 U.S. at 657 (quoting *Buckley,* 424 U.S. at 39), is a prior restraint. *But see Samuelson v. LaPorte Community School Corp.,* 528 F.3d 1046, 1051 (7th Cir. 2008) (listing elements of a prior restraint in current Seventh Circuit law under which the oath is not a prior restraint (citations omitted)).[89]

"[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559 (1976). They have "an immediate and irreversible sanction." *Id.* "Prior restraints are particularly disfavored and bear a heavy presumption against validity because 'a free society prefers to punish the few who abuse rights of speech after they break the law [rather] than to throttle them and all others beforehand.'" *United States v. Masel,* 54 F. Supp.2d 903, 909 (W.D. Wis. 1999) (quoting *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 559 (1975)). This is especially so when law restrains "political speech, which is at the heart of

---

[89] Plaintiffs appreciate that the Seventh Circuit binds this Court.

76

our democratic process and 'operates at the core of the First Amendment.'" *ARLPAC,* 320 F.3d at 1008 (quoting *Boos v. Barry,* 485 U.S. 312, 318 (1988)).

While the delay in speech that Wisconsin law causes may be only brief, that does not make it constitutional. *See id.* (rejecting a 24 hour delay (quoting *Grossman v. City of Portland,* 33 F.3d 1200, 1206 (9th Cir. 1994))). "Restricting spontaneous political expression places a severe burden on political speech because, as the Supreme Court has observed, 'timing is of the essence in politics and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all." *Id.* (quoting *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 163 (1969) (Harlan, J., concurring) (ellipsis omitted)). "To suggest that the waiting period is minimal ignores the reality of breakneck political campaigning and the importance of getting the message out in a timely, or, in some cases, even instantaneous fashion." *Id.* In addition, such a requirement "effectively prohibits speech in situations where the communication was not, or could not have been, prepared far enough in advance" for the committee to comply. *Id.*

For these reasons, no compelling government interest supports Wisconsin's prior restraint. In the alternative, the law is not narrowly tailored, for the same reasons.

In addition, exacting scrutiny applies to this disclosure requirement,[90] the law fails exacting scrutiny, and the law is unconstitutional as applied to WRTL-

---

[90] *See supra* Part I.G.1.

Case 2:10-cv-00669-CNC   Filed 08/05/10   Page 77 of 89   Document 4

SPAC's speech. The requirement is so great that the government's interest does not reflect the burden on the speech. *See Davis,* 128 S.Ct. at 2775 (citing *Buckley,* 424 U.S. at 68). Each year by January 31, which is often long before a committee does its speech – and often long before a committee even plans its speech – a committee must guess whether the speech is an "independent disbursement" and whom it will mention. Then a committee must continually update its guess throughout the year if, for example, it wants to change whom its "independent disbursements" mention.[91] This oath requirement is especially burdensome, given how quickly and frequently political-speech plans arise and change. *See Shuttlesworth,* 394 U.S. at 163 (Harlan, J., concurring), The burden is especially great on small committees such as WRTL-SPAC. *Cf. WRTL II,* 551 U.S. at 477 n.9 (referring to political-committee burdens on small nonprofit corporations (citing *MCFL,* 479 U.S. at 253-55)).

### J.      Overbreadth:  Political Committee Reporting Thresholds

As to the political-committee reporting thresholds,[92] assuming Wisconsin has a compelling interest under strict scrutiny in regulating WRTL-SPAC as a political committee and thereby requiring full-fledged political-committee reporting by WRTL-SPAC – as opposed to WRTL – *see Austin,* 494 U.S. at 658; *see generally Buckley,* 424 U.S. at 66-67 (*Buckley* Interest 2), the $20 and $100 reporting

---

[91] VC Part I.C.3.

[92] VC Part I.C.4.

Case 2:10-cv-00669-CNC   Filed 08/05/10   Page 78 of 89   Document 4

thresholds are so low that there is no substantial relation to a sufficiently important government interest under exacting scrutiny. *See Canyon Ferry,* 556 F.3d at 1033 (referring *pre-Citizens United* to tailoring); *id.* at 1036 (Noonan, J., concurring) ("How do the names of small contributors affect anyone else's vote? Does any voter exclaim, 'Hank Jones gave $76 to this cause. I must be against it!'"). The "value of this financial information to the voters declines drastically as the value of the expenditure or contribution sinks to a negligible level." *Id.* at 1033 (controlling opinion) (emphasis omitted).

This is especially so since Wisconsin does not index its $20 or $100 reporting thresholds for inflation, which means its real value declines every year. *See Randall v. Sorrell,* 548 U.S. 230, 261 (2006).

Therefore, the political-committee reporting thresholds are unconstitutional as applied to WRTL-SPAC's speech.

### K. Overbreadth: The Political Committee Contribution Limit and Solicitations for an Entity's Separate Segregated Fund

#### 1. Strict Scrutiny for Contribution Limit

As to the limit on contributions WRTL-SPAC receives,[93] WRTL-SPAC does only independent spending for political speech – in particular, it does only independent expenditures – and only for state or local candidates in Wisconsin. It

---

[93] VC Part I.C.5.

79

makes no contributions to such candidates.[94]   Thus, the contribution limit *vis-à-vis WRTL-SPAC's speech* in effect is an independent-expenditure limit.   *See EMILY's List,* 581 F.3d at 14 n.13 (citing *California Med. Ass'n v. FEC,* 453 U.S. 182, 202 (1981) (Blackmun, J., concurring)); *cf. id.* at 15 n.14.   Independent-expenditure limits receive strict scrutiny, *see FEC v. National Conservative PAC,* 470 U.S. 480, 496-97 (1985) ("*NCPAC*") ("sufficiently strong government[] interest … narrowly tailored"; "legitimate and compelling government interests"), and are unconstitutional. *Buckley,* 424 U.S. at 39-51.  Therefore, the limit on WRTL-SPAC's independent expenditures, *i.e.,* the contribution limit, is unconstitutional *as applied to* WRTL-SPAC's speech.   *See California Med.,* 453 U.S. at 203 (Blackmun, J., concurring).   The Supreme "Court has *never* held that it is constitutional to apply contribution limits to political committees that make solely independent expenditures." *NCRL III,* 525 F.3d at 292 (emphasis in original).

## 2.     Intermediate Scrutiny for Contribution Limit

In the alternative, Wisconsin's contribution limit is unconstitutional as applied to WRTL-SPAC's speech, because – as a contribution limit – it fails intermediate scrutiny, just as North Carolina's did.  *See id.* at 291-93.

Under intermediate scrutiny, a court first asks whether there is a "sufficiently important" government interest in regulating the speech.  Only if there is does a court ask whether the law is "closely drawn" to achieve that interest.  *FEC*

---

[94] Although it is not material, WRTL-SPAC does not make contributions to *any* candidates.

Case 2:10-cv-00669-CNC   Filed 08/05/10   Page 80 of 89   Document 4

*v. Colorado Republican Fed. Campaign Comm.,* 533 U.S. 431, 446 (2001) ("*Colorado Republican II*") (quoting *Nixon v. Shrink Mo. Gov't PAC,* 528 U.S. 377, 388 (2000)).

Wisconsin lacks a sufficiently important interest in limiting contributions to political committees that do only independent spending for political speech, including independent expenditures. In the alternative, Wisconsin's contribution limit is not closely drawn to achieve whatever sufficiently important interest Wisconsin may have. The "entities furthest removed from the candidate are political committees that make solely independent expenditures. As such, it is 'implausible' that contributions to independent expenditure political committees are corrupting." *Id.* at 293 (quoting *North Carolina Right to Life, Inc. v. Leake,* 344 F.3d 418, 434 (4th Cir. 2003) ("*NCRL II*"), *cert. granted and judgment vacated on other grounds,* 541 U.S. 1007 (2004)).

In other words, limits on contributions to political committees doing only independent spending for political speech – including independent expenditures – are unconstitutional regardless of the level of scrutiny. *Long Beach Area Chamber of Commerce v. City of Long Beach,* 603 F.3d 684, 691-99 (9th Cir. 2010); *SpeechNow.org v. FEC,* 599 F.3d 686, 692-96 (D.C. Cir. 2010) (*en banc*), *pet. for cert. filed,* (U.S. undated).[95]

---

[95] *Available at* http://www.scotusblog.com/wp-content/uploads/2010/07/SpeechNow-petition-7-23-10.pdf.

### 3. Scrutiny for Limit on Solicitations for an Entity's Separate Segregated Fund

As for the limit on solicitations for an entity's separate segregated fund, *i.e.,* its own political committee,[96] regardless of the level of scrutiny, such a limit is unconstitutional as applied to the entity's speech and the political committee's speech when the political committee does only independent spending for political speech. This is so for the same reasons that the contribution limit is unconstitutional. Wisconsin lacks a sufficiently important interest in this limit. In the alternative, the limit is not closely draw to achieve whatever sufficiently important interest Wisconsin may have.

### L. Overbreadth: Attribution and Disclaimer Requirements

The regulatory attribution and disclaimer requirements[97] are so great that the government's interest does not reflect the burden on the speech. *See Davis,* 128 S.Ct. at 2775. This regulation of the content of WRTL's speech will take up precious air time and distract those receiving the speech from WRTL's message. Besides, how is anyone to fit all the information the law requires into a 30 second ad, or even a 60 second ad, and still have time to say much else? WRTL will follow the *statutory* attribution and disclaimer requirements, thereby identifying itself on its speech and confirming its independent expenditures are indeed independent, *see* WIS. STAT. § 11.30.2.b, d, yet the *regulatory* attribution and disclaimer requirements

---

[96] VC Part I.C.6.

[97] VC Part I.C.7.

Case 2:10-cv-00669-CNC    Filed 08/05/10    Page 82 of 89    Document 4

are different. They are so burdensome that government has no sufficiently important interest in them. In the alternative, there is no substantial relation to any sufficiently important government interest. They are unconstitutional as applied to WRTL-SPAC's speech.

### M. Facially Unconstitutional

When a facial challenge is purely a Fifth or Fourteenth Amendment challenge, and thus has no First Amendment component, the challenging party must prove the law is unconstitutional in all its applications. *See United States v. Salerno,* 481 U.S. 739, 745 (1987). However, when a law burdens free speech, the challenging party need only meet a lower First Amendment standard for facial unconstitutionality, even when the party also challenges the law as unconstitutionally vague under the Fifth or Fourteenth Amendment. *See id.* (recognizing the substantial-overbreadth doctrine under the First Amendment (citing *Schall v. Martin,* 467 U.S. 253, 269 n.18 (1984))); *Kolender v. Lawson,* 461 U.S. 352, 358 & n.8 (1983) (rejecting the dissent's contention that a *Salerno*-like burden applied), *followed in City of Chicago v. Morales,* 527 U.S. 41, 60 (1999).

A state law is facially unconstitutional under the First Amendment, *Washington State Grange v. Washington State Republican Party,* 552 U.S. 442, 449 n.6 (2008) (citing *New York v. Ferber,* 458 U.S. 747, 769-71 (1982)), *quoted in United States v. Stevens,* 559 U.S. ____, ____, 130 S.Ct. 1577, 1587 (2010), and a state law burdening free speech is facially unconstitutional for vagueness under the Fourteenth Amendment, *see Salerno,* 481 U.S. at 745 (citing *Schall,* 467 U.S. at 269

83

n.18); *Kolender,* 461 U.S. at 358 & n.8, *followed in Morales,* 527 U.S. at 60, when it reaches "a substantial amount of protected speech … not only in an absolute sense, but also relative to the [law's] plainly legitimate sweep." *United States v. Williams,* 553 U.S. 285, 292-93 (2008) (citing *Board of Trs. of State Univ. of N. Y. v. Fox,* 492 U.S. 469, 485 (1989); *Broadrick v. Oklahoma,* 413 U.S. 601, 615 (1973)).

On this point in a facial challenge, the burden of proof is on the party asserting a law is facially unconstitutional. *McConnell,* 540 U.S. 93, 207 (2003) (citing *Broadrick,* 413 U.S. at 613), *cited in North Carolina Right to Life, Inc. v. Leake,* 525 F.3d 274, 285 (4th Cir. 2008) ("*NCRL III*"). It is important to remember, however, that the presence of a facial challenge does not free the government of its burden of proof under the as-applied challenge. The *government* has the burden of proving the law survives scrutiny. *See FEC v. Wisconsin Right to Life, Inc.,* 551 U.S. 449, 464 (2007) ("*WRTL II*") (as-applied challenge (citing *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 786 (1978))). It cannot be the challenging party's burden to prove the law does *not* survive scrutiny, because that would require proving a negative. *Cf. Elkins v. United States,* 364 U.S. 206, 218 (1960) ("it is never easy to prove a negative").

Whether the challenge is based on the First Amendment, Fourteenth Amendment, or both, all of the law that is unconstitutional as applied to particular Plaintiffs' speech – except the aggregate contribution limit and the limit on

84

solicitations for an entity's separate segregated fund[98] – is also facially unconstitutional.  By not adhering to the case law, this law reaches substantially beyond whatever plainly legitimate sweep it may have.  It ensnares grassroots entities in Wisconsin and elsewhere that communicate about issues, thereby engaging in speech at the core of the First Amendment.  *See NCRL III,* 525 F.3d at 285-86 (holding a definition of "support or oppose," which is part of PASO, facially unconstitutional); *id.* at 289-90 (holding a political-committee definition facially unconstitutional); *National Right to Work Legal Def. & Educ. Found., Inc. v. Herbert,* 581 F. Supp.2d 1132, 1151-54 (D. Utah 2008) (same); *Broward Coal. of Condos., Homeowners Ass'ns & Cmty. Orgs., Inc. v. Browning,* No. 08-445, 2009 WL 1457972 at *7-8 (N.D. Fla. May 22, 2009) (holding multiple provisions facially unconstitutional);[99] *Broward,* 2008 WL 4791004 at *10-12 (N.D. Fla. Oct. 29, 2008) (holding a "definition of electioneering communications and its attendant regulation of speech" facially unconstitutional), *clarified on other grounds,* 2008 WL 4878917 (N.D. Fla. Nov. 2, 2008)[100]); *Florida Right to Life, Inc. v. Mortham,* No. 98-770CIVORL19A, 1999 WL 33204523 at *4-5 (M.D. Fla. Dec. 15, 1999) ("*FRTL*") (holding a political-committee definition facially unconstitutional because it "expressly includes 'groups whose "incidental purpose" is to "support or oppose"

---

[98] *Supra* Part II.K.

[99] PRELIM. INJ. MOT. Exh. 1.

[100] PRELIM. INJ. MOT. Exh. 2.

85

candidates'"),[101] *aff'd,* 238 F.3d 1288 (11th Cir. 2001), *and rev'd on other grounds,* 273 F.3d 1318, 1326-28 (11th Cir. 2001) (rejecting a narrowing gloss); *cf. Vote Choice v. DiStefano,* 4 F.3d 26, 36 (1st Cir. 1993) (holding political-committee disclosure requirements facially unconstitutional in a challenge by political committees).

The Supreme Court has never upheld such sweeping regulation of political speech. Thus, Wisconsin may not simply point to FECA, cite *McConnell,* and claim its law is facially constitutional. By regulating speech substantially beyond the Constitution's boundaries, Wisconsin "swallow[s] up practically all ordinary political speech." *Broward,* 2008 WL 4791004 at *11 (citing *NCRL III,* 525 F.3d at 283). To uphold Wisconsin law facially "would be to uphold a [law] far beyond anything approved in *McConnell,* and in direct contradiction to" Supreme Court case law. *NCRL III,* 525 F.3d at 286. As in *NCRL III, id.* at 285, Wisconsin law is full of constitutional flaws.

> The number of as-applied challenges necessary to remedy the overbreadth and vagueness of this [law] would involve many different lawsuits and litigation that would take years to conclude. In the meantime, political speakers would be left at sea ... . Nothing in *McConnell, WRTL* [*II*], or any First Amendment tradition ... forces political speakers to incur these sorts of protracted costs to ascertain nothing more than the scope of the most basic right in a democratic society – the right to engage in discussion of issues of unquestioned public importance.

---

[101] PRELIM. INJ. MOT. Exh. 3.

*Id.* For these reasons, Wisconsin's attempt to expand the field of regulable speech beyond what even *McConnell,* to say nothing about *WRTL II* and *Citizens United,* approved is facially unconstitutional.

Under such circumstances, a court should embrace a facial holding. "Any other course of decision would prolong the substantial … chilling effect" Wisconsin law causes. *Citizens United,* 130 S.Ct. at 894. "It is not judicial restraint to accept a[] narrow argument just so the Court can avoid another argument with broader implications." *Id.* at 892.

In sum, Wisconsin law is unconstitutional both as applied and facially, both because it is vague, and therefore overbroad, and because it fails the appropriate level of scrutiny. The contribution limit, contribution-source bans, and limit on solicitations for an entity's separate segregated fund, however, are unconstitutional only as applied to WRTL-SPAC's, WRTL-SPAC's, and both Plaintiffs' speech, respectively.

### N.    Narrowing Glosses, Certification, and Severability

Unlike in *Buckley v. Valeo,* 424 U.S. 1, 44 & n.52, 80 (1976), no narrowing gloss saves the unconstitutional law in this action. Plaintiffs (1) challenge state law (2) both as applied to their speech and facially. Unlike in federal-court challenges to *federal* law, *e.g., Boumediene v. Bush,* 553 U.S. 723, ____, ____, 128 S.Ct. 2229, 2240, 2271 (2008), narrowing glosses (1) apply in federal-court challenges to *state* law only when they are "reasonable and readily apparent." *Stenberg v. Carhart,* 530 U.S. 914, 944 (2000) (quoting *Boos v. Barry,* 485 U.S. 312, 330 (1988)). A

federal court does not "rewrite a state law to conform it to constitutional requirements." *Virginia v. American Booksellers Ass'n, Inc.,* 484 U.S. 383, 397 (1988), *quoted in Colorado Right to Life Comm., Inc. v. Coffman,* 498 F.3d 1137, 1154 (10th Cir. 2007) ("*CRLC*"), *and Vermont Right to Life Comm., Inc. v. Sorrell,* 221 F.3d 376, 386 (2d Cir. 2000) ("*VRLC I*"); *ACLU v. Heller,* 378 F.3d 978, 986 (9th Cir. 2004) (quoting *Stenberg,* 530 U.S. at 944); *Florida Right to Life, Inc. v. Lamar,* 273 F.3d 1318, 1326 (11th Cir. 2001) (quoting *Dimmitt v. City of Clearwater,* 985 F.2d 1565, 1572 (11th Cir. 1993)). As in *VRLC I,* 221 F.3d at 388-89, 390-91, there is no way to make Wisconsin law constitutional without rewriting it. *See also North Carolina Right to Life, Inc. v. Bartlett,* 168 F.3d 705, 711 (4th Cir. 1999) ("*NCRL I*") (rejecting a narrowing gloss for a state's political-committee definition), *cert. denied,* 528 U.S. 1153 (2000); *Heller,* 378 F.3d at 986 (rejecting a narrowing gloss); *FRTL,* 273 F.3d at 1326-28 (same). Moreover, narrowing glosses (2) generally apply only to facial challenges, not as-applied challenges. *CRLC,* 498 F.3d at 1154 (quoting *American Booksellers,* 484 U.S. at 397). Therefore, no narrowing gloss applies here.

Nor is certifying a question appropriate where, as here, the state law is not "fairly susceptible" to a narrowing gloss. *Stenberg,* 530 U.S. at 945 (quoting *Houston v. Hill,* 482 U.S. 451, 468-71 (1987)).

Furthermore, severing the unconstitutional language from the remaining language – which is a question of state law, *VRLC I,* 221 F.3d at 389 (citing *Watson v. Buck,* 313 U.S. 387, 395-96 (1941)) – is not an option in this action, because severing would not leave what remains "intact and in full effect." *State v. Janssen,*

88

580 N.W.2d 260, 267 (Wis. 1998) (citing *State v. Thiel,* 515 N.W.2d 847 (1994)); *see also Randall v. Sorrell,* 546 U.S. 230, 262 (2006). It would not be "fully operative as a law." *Id.* (quoting *Regan v. Time, Inc.,* 468 U.S. 641, 653 (1984)). Nor is it evident that the legislature or GAB "would not have enacted those provisions which are within its power, independently of that which is not[.]" *Id.*

## III.    Conclusion

For the foregoing reasons, Plaintiffs request that the Court grant their preliminary-injunction motion.

Respectfully submitted,

/s/ Michael D. Dean

Michael D. Dean,
Wis. No. 1019171
FIRST FREEDOMS
FOUNDATION, INC.
20975 Swenson Drive, Suite 125
Waukesha, Wis.  53186
Telephone (262) 798-8046
Facsimile  (262) 798-8045
*Local Counsel for Plaintiffs*

/s/ Randy Elf

James Bopp, Jr., Ind. No. 2838-84
Randy Elf, New York No. 2863553
Joseph A. Vanderhulst, Ind. No. 28106-20
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Ind.  47807
Telephone (812) 232-2434
Facsimile  (812) 234-3685
*Lead Counsel for Plaintiffs*

August 4, 2010

89